163 P.3d 1034

**John DAWSON, an individual, Plaintiff/Appellee/Cross–Appellant,**

v.

**F. Keith WITHYCOMBE and Patricia Withycombe, husband and wife; and Roderick Turner and Terry C. Turner, husband and wife, Defendants/Appellants/Cross–Appellees.**

**No. 1 CA–CV 06–0043.**

Court of Appeals of Arizona, Division 1, Department C.

July 24, 2007.

Kutak Rock, LLP By E. Scott Dosek, Todd B. Tuggle, Alvin A. Velazquez, Scottsdale, Attorneys for F. Keith Withycombe and Patricia Withycombe.

Shughart Thomson & Kilroy P.C. By Rudolph J. Gerber, Phoenix, Attorneys for Roderick Turner and Terry Turner.

Gallagher & Kennedy, P.A. By Mark C. Dangerfield, Kevin O'Malley, Mark A. Fuller, Phoenix, Attorneys for John Dawson.

## OPINION

KESSLER, Judge.

¶ 1 This appeal requires us to clarify when corporate directors may be personally liable to corporate creditors and potential creditors for misrepresentations made by other corporate officers and for constructive fraud. We must also address the scope of the duty of directors to corporate creditors when the corporation enters a zone of insolvency, as well as issues of personal liability for negligent supervision of corporate employees, punitive damages and pre-judgment interest. For the reasons stated below, we vacate the judgment against the appellants and remand for a new trial on the issue of personal liability for fraud committed by an agent.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Defendants–Appellants–Cross–Appellees F. Keith and Patricia Withycombe ("Withycombe") and Roderick Turner and Terry Turner ("Turner") appeal the superior court's entry of judgment finding them liable for damages to Plaintiff–Appellee–Cross–Appellant John Dawson ("Dawson") resulting from fraud and constructive fraud.[1] Dawson cross-appeals the superior court's orders dis-

---

1.  While both Turner and Withycombe and their spouses were defendants, we will refer to Turner and Withycombe individually in their dealings with Dawson and Futech Interactive Products.

missing his claims for punitive damages and negligence, and its calculation of prejudgment interest.

¶ 3 Futech Interactive Products, Inc. ("Futech") was a small corporation founded in the 1990's. Vincent Goett ("Goett") was chief executive officer and chairman of the board of directors ("the Board"). Turner was a member of the Board. Prior to the events culminating in this lawsuit, Turner and Goett had made or guaranteed substantial loans to Futech. Robert Rosepink ("Rosepink") became a member of the Board in early 1998 and remained on the Board throughout 1999.

¶ 4 During the latter part of 1998, Rosepink approached Dawson and Withycombe to present them with an opportunity to invest in Futech.[2] After meeting with Goett and receiving financial information about Futech, which he forwarded to his chief financial officer for advice, Dawson initially declined to invest in Futech. Withycombe, however, agreed to co-guarantee a $7 million loan in December 1998 and then became a member of the Board.

¶ 5 In January 1999, Turner contacted Withycombe to request a meeting. Turner and Withycombe met in Cabo San Lucas, where Turner spoke with Withycombe about his perception of the financial condition of Futech. Withycombe's notes from the meeting reflect that Turner informed him that Futech lost $20 million in the last three years, Goett had taken between $4 million and $6 million from the company in the form of fees, and had usurped the function of the chief financial officer, the company was "cash poor," and that, if the company went public and was subject to public company requirements, the situation could result in liability for the Board members. Turner also stated, on the other hand, that Futech had excellent team members and had acquired companies that brought in management talent, that it had excellent patent positions and products, and that a public offering could create financing opportunities. Turner acknowledged that he had not paid enough attention to

Futech previously. According to Withycombe, Turner wanted Withycombe to act as his "ally" to resolve Futech's financial situation.

¶ 6 Withycombe's notes reflect he responded that he thought he had been misled, apparently by Goett, as to Futech's prospects and the security of his loan guaranty, but that his nature was to solve problems rather than tear things down. Following the meeting, Turner was to meet with Goett to develop a compensation plan for Goett and have Goett return excess compensation as well as make other changes at Futech. Withycombe's notes reflected that any plan developed should be supported by Goett, that the Board should be redirected toward looking after shareholder interests, that a new CEO with appropriate authority and compensation was needed, that Futech needed to start moving toward becoming a public company, and that there should be an operating plan for 1999 that included additional financing.

¶ 7 The following month, Withycombe, Goett, Turner, and Rosepink met. Goett told Withycombe that the Board had previously approved a compensation package in which he took a 10 per cent fee on all financing he brought into the company in lieu of a salary. Withycombe's notes reflect that he was told that all accounts payable were current and on track.

¶ 8 Meanwhile, Rosepink again approached Dawson and informed him that Withycombe had become involved in the company. Rosepink testified that this piqued Dawson's interest, and Rosepink provided financial information to Dawson's CFO over the following months.

¶ 9 On May 12, 1999, Goett met with Withycombe to request that Withycombe lend additional funds to Futech. Withycombe agreed to loan $2 million to Futech in exchange for warrants to purchase stock in Futech and on the condition that on December 1, 1999, he would be released from the guaranty on the $7 million December 1998 loan. Withycombe further testified that, as

---

**2.** Both Dawson and Withycombe received estate planning services from Rosepink. Dawson, Withycombe, and Rosepink are all members of the same country club. Dawson became Withy-

combe's neighbor in early 1999, when he purchased the home next to Withycombe's from Withycombe.

of this meeting, he was aware that Rosepink and Goett were negotiating with Dawson, for what he thought was a $5 million investment.

¶ 10 The following week, Withycombe met with Dawson at Dawson's invitation. According to Dawson, they barely talked about Futech at lunch, but Dawson did ask Withycombe what he thought about the future of Futech. Withycombe responded that it was very definitely a venture capital deal and that there were good people involved with it. According to Withycombe, Dawson did most of the talking during lunch. Dawson did ask Withycombe what he thought about Rosepink. Withycombe responded that they were friends, and Dawson said that Dawson was feeling pressure from Rosepink to get involved with Futech.

¶ 11 On May 27, 1999, the Board convened for a meeting. The final minutes of the meeting, signed by Futech's CFO, Fred Gretsch ("Gretsch"), state that "the Corporation plans to borrow $5,000,000 from John Dawson and all actions taken by the officers of the Corporation for and on behalf of the Corporation in entering into such loan, are hereby in all respects ratified, approved, and affirmed." [3] According to Gretsch, there was no discussion of the loan terms, but that it would have been nothing new for the Board to authorize Goett to "do what he needed to do" because there had never been constraints or restrictions placed upon Goett to obtain funds. Turner testified that the Board did not in fact approve the Dawson loan, but that there was a general intent to do something. As of January 2000, the Board had not approved the minutes.

¶ 12 Key to our decision was an alleged misrepresentation concerning the priority of security between Dawson and other prior lenders. As the loan negotiations with Dawson continued, Dawson informed Rosepink that he wanted the same arrangement as Withycombe, but with a security interest priority immediately behind that of Withycombe. When Dawson met with the bank

that was to loan the money, the bank informed him that it had reached the limit of its lending for Futech, but that it would consider making a direct loan to Dawson that Dawson could in turn make available to Futech. Dawson received a summary of a proposal for interim financing that provided that Dawson borrow $5 million from the bank on an unsecured revolving credit basis, which Dawson would in turn make available to Futech. It further stated that the loan agreement and security interest would be identical in form and substance to those used in Withycombe's loans, and that Dawson would retain a security interest in all of Futech's assets. While the summary of the proposal stated that Dawson's security interest would be junior only to the rights of "Futech's asset-based lenders" and Withycombe's loans, those "lenders" were not defined. More importantly, the loan agreement provided that all loans made to Futech "by anyone (including loans made by shareholders ... ) other than Bank of America ... and ... Withycombe are expressly made subordinate" to the line of credit.

¶ 13 The proposal also stated in part that

Because until recently Futech has been a research and development company, its revenues have been insufficient to finance its growth, including creation of the new Internet site. Futech has an immediate need for capital to help finance the acquisition of the merged companies and to meet short-term operational needs. However, Futech has secured an underwriter which has committed to helping Futech raise by private placement some of its stock sufficient capital to meet all of its short and immediate term needs. Proceeds from such private placement, as well as increased revenues from sales of additional products, will allow Futech to repay the financing being sought from Dawson.

Dawson also testified that Goett told him that because it was expected that Futech

---

**3.** The accuracy of this statement was contested at trial. Gretsch testified that the minutes had been prepared by Futech's attorneys in advance of the meeting, and often the minutes were not discussed at the actual meetings. The record reflects that, in the initial draft of the minutes, this section began, "the Corporation borrowed $5,000,000 from John Dawson," and that Gretsch changed the language because the loan had not yet occurred and he was not sure it would occur.

would receive public financing as well as a private placement shortly, the line of credit might not be drawn at all, and that it would function merely as a bridge or gap loan.

¶ 14 Dawson ultimately provided a line of credit to Futech. According to the loan agreement, signed on August 4, 1999 by Goett and Dawson, the line of credit would expire on December 1, 1999, at which time all amounts borrowed and interest would be paid in full. The loan agreement provided that the loan was made junior only to the prior Bank of America and Withycombe loans. Dawson assumed at the time he entered into the loan that the Board had looked at and approved the transaction. Turner, however, testified that he was not aware of the proposed terms of the loan as they were being negotiated, and that the Board did not approve the loan before it was consummated. Withycombe became aware that the loan had been made a week after it was consummated.

¶ 15 By the end of August, Futech had drawn $3.5 million on the line of credit. Futech drew the full line of credit by October 1999. Futech did not repay the loan on December 1, 1999. Futech eventually declared bankruptcy, and Withycombe testified that at that point he realized Goett had misrepresented to him the priorities of loans, that another bank had liens on all of Futech's assets and inventory, and Turner's interest was superior to both the Bank of America and his own interest.

¶ 16 Dawson filed suit alleging against Withycombe and/or Turner: (1) conspiracy or acting in concert to have Rosepink breach his fiduciary duty to Dawson; (2) securities fraud; (3) sale of unregistered securities; (4) fraud by misrepresentation; (5) breach of fiduciary duty/fraud by nondisclosure; (6) fraud by false or reckless promise; (7) constructive fraud; and (8) negligence.[4] Dawson also claimed he was entitled to punitive damages. Dawson alleged that "each of the defendants was the agent of each of the other defendants at Futech, acting within the course and scope of said agency." In his claim of secondary liability for securities fraud, Dawson alleged in part that all the defendants acted as agents of each other as to misrepresentations and each was liable as a principal for the others' acts. All of the subsequent causes of action incorporated the previous allegations by reference.

¶ 17 Withycombe and Turner each moved for summary judgment and joined in one another's motions. The court granted the motions for summary judgment as to the securities claims, the negligence and breach of fiduciary duty claims, and all allegations for punitive damages. Thus, the remaining claims were: (1) conspiracy or acting in concert to breach Rosepink's fiduciary duty to Dawson: (2) fraud by misrepresentation; (3) fraud by false or reckless promise; and (4) constructive fraud.

¶ 18 The case was presented to a jury. At the close of Dawson's evidence, Withycombe moved for judgment as a matter of law, in which Turner joined. They did not, however, move for judgment as a matter of law on any claim for which they could be liable on principal and agency theories. At the close of the evidence, the court granted judgment as a matter of law on the claim of conspiracy to commit or aiding and abetting breach of fiduciary duty and the claim for fraud based on reckless promise. Thus, the only claims that went to the jury were fraud by misrepresentation (on theories of agency, aiding and abetting and conspiracy) and constructive fraud.

¶ 19 The fraudulent misrepresentation claim was based on two theories. First, that Dawson was extending the loan for the short period of time between when the loan was procured and the imminent infusion of public investment and private financing. This understanding was based upon the July S-4 statement Goett provided, as well as Goett's

---

4. Dawson initially filed claims against Rosepink as well, including for breach of fiduciary duty. Rosepink was voluntarily dismissed from the lawsuit after he entered into a settlement with Dawson. Dawson settled with Rosepink for $2 million on October 26, 2000.

Goett was also named as a defendant in the complaint. The proceedings against him were apparently stayed, as he was in bankruptcy proceedings until mid-way through the trial. The court stated that, due to the late date on which the stay was lifted, Dawson would have to pursue his damages against Goett separately.

representations that Futech would soon become a publicly traded company, that there was a potential underwriter who would provide significant financing upon filing of the S–4, and another investor who would provide funding after the S–4 was deemed effective. Second, that Dawson was making the loan on the understanding that his loan would be secured by Futech's assets and his priority in that security would be junior only to the Bank of America and Withycombe loans.

¶ 20 The jury found Withycombe and/or Turner liable for the improper actions or inactions of Goett and/or Rosepink on a principal-agency theory and that Withycombe had conspired with Rosepink and/or Goett to harm Dawson. The jury found Withycombe and Turner each 35 per cent at fault for aiding and abetting fraudulent misrepresentation and 40 per cent at fault each for constructive fraud. The jury found that Dawson was damaged in the amount of $5 million.

¶ 21 Dawson filed a proposed form of judgment, which requested interest on the judgment of $5 million at 10 per cent per annum, calculated from December 1, 1999, the date the loan became due, plus the interest that had accrued on the loan prior to the date the loan became due. The form of judgment subtracted the $2 million Dawson had already received from the Rosepink settlement after the calculation of interest. Turner and Withycombe objected. The court entered judgment, finding that the starting principal was $3 million, with interest having accrued on that amount from the dates service was complete on the respective defendants. The court reasoned that prejudgment interest should not accrue prior to the dates of service because no demand for payment had ever been made on Turner or Withycombe.

¶ 22 Turner and Withycombe filed renewed motions for judgment as a matter of law and moved for a new trial. The court denied those motions. Turner and Withycombe appealed and Dawson cross-appealed. This Court has jurisdiction pursuant to Arizona

Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## ANALYSIS

### I. Issues on Appeal

¶ 23 Withycombe and Turner raise numerous arguments as to each of the theories on which they were found liable. Withycombe also contends that he was entitled to a remittitur. Both appellants also contend that the alleged misrepresentations did not amount to fraud, which would require reversal of the judgment on most of the counts presented to the jury. We will first address the sufficiency of the alleged misrepresentations which form the basis for Dawson's claims against the appellants. We will then address the other issues on appeal.

#### A. The Underlying Fraud

¶ 24 Turner and Withycombe argue there was insufficient evidence to support the underlying fraud allegation. They argue the superior court should have granted their motions for judgment as a matter of law and/or for a new trial.

¶ 25 We review for an abuse of discretion a court's denial of a motion for a new trial on the grounds that the verdict is against the weight of the evidence. *Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996). We review de novo a court's ruling on a motion for directed verdict and a motion for judgment as a matter of law. *Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997). At the same time, we view the evidence and all reasonable inferences drawn from the evidence in a light most favorable to the non-moving party, and will reverse a court's denial only upon a showing that there is no probative evidence in the record to support the ultimate verdict. *Id.* (judgment as a matter of law); *Styles*, 185 Ariz. at 450, 916 P.2d at 1166 (motion for a new trial). *See also Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998) ("if any substantial evidence exists permitting reasonable persons to reach such a result, we will affirm the judgment.").[5]

---

5. This same standard applies to all of the arguments contending the superior court erred in

denying the Rule 50 or 59 motions.

¶ 26 A civil claim for fraud is established by showing that the tortfeasor made a false and material representation,[6] with knowledge of its falsity or ignorance of its truth, with intent that the hearer would act upon the representation in a reasonably contemplated manner, and that the hearer, ignorant of the falsity of the representation, rightfully relied upon the representation and was thereby damaged. *Enyart v. Transamerica Insurance Co.*, 195 Ariz. 71, 77, ¶ 18, 985 P.2d 556, 562 (App.1998). Turner and Withycombe argue that the representations at issue cannot form the basis of a civil claim for fraud, that there was no showing that Goett was aware of the falsity of the representations, or that Dawson rightfully relied on the representations.

### 1. Nature of Representations

¶ 27 Turner and Withycombe argue that the representations about future public financing and the prospective private placement were statements of future prospects that cannot form a basis for a fraud claim. Our supreme court has expounded upon the extent to which future promises made in the scope of a business negotiation may form the basis of a claim for fraud:

The general rule is that in order to constitute actionable fraud, the false representation must be of a matter or fact which exists in the present, or has existed in the past and cannot be predicated upon the mere expression of an opinion or upon representations in regard to matters of estimate or judgment. The person to whom statements of the character last mentioned are made has no right to rely

upon them and does so at his peril, nor can they be supposed to influence his judgment......

While a statement of a matter to occur in the future, if affirmed as a fact, may amount to a false or fraudulent representation, it must be an actual assertion of a fact and not merely an agreement to do something in the future. It is the general rule that statements or representations as to the future value or profitableness or prospects of a business are mere expressions of opinion, and a representation that something will be done in the future or a promise to do it is at most a contract and not a fraudulent representation such as will sustain an action of this nature. There is one exception to this last-named rule, and that is where the promise to perform a future act was made with a present intention on the part of the promissor that he would not perform it. In such a case the promise is a basis for action of fraud.

*Law v. Sidney*, 47 Ariz. 1, 4–5, 53 P.2d 64, 66 (1936).

¶ 28 Dawson primarily contends he had agreed to the line of credit based upon an understanding that Futech's financing prospects were such that it might need available capital for the short period of time between when the loan was procured and the imminent infusion of public investment and private financing. This understanding was based upon the July S–4 statement Goett provided, as well as Goett's representations that Futech would soon become a publicly traded company, that there was a potential underwriter who would provide significant financing upon filing of the S–4, and another

---

**6.** Dawson relies on alleged facts that were not disclosed to him as additional factual support for the judgment and points out that the jury instructions permitted the jury to consider omissions as part of the misrepresentation claim. We need not address whether such alleged failures to disclose certain facts were actionable for several reasons. First, to the extent the alleged omissions to which Dawson points on appeal occurred, any actionable claim against Appellants directly for constructive fraud based on nondisclosure is limited to omissions after August 4, 1999. This is because the superior court granted Appellants summary judgment on count six, the only direct claim against them for nondisclosure, except for acts after the loan agreement was

executed. As we explain later in this opinion, *infra*, ¶¶ 61–77, such a claim is barred for other reasons.

Second, as discussed below, we are remanding the agency claim against Appellants for a new trial. *Infra*, ¶¶ 41–48. To the extent that Goett had a duty to disclose certain facts to Dawson and failed to do so, and Dawson can meet the other elements for agency liability, he can pursue such a claim for omissions on remand. We note, however, that such a claim must be limited to specific present actionable facts and not just opinions on the value of Futech. *Sorrells v. Clifford*, 23 Ariz. 448, 458–59, 204 P. 1013, 1017 (1922).

investor who would provide funding after the S–4 was deemed effective. Dawson characterizes these statements as representations of a present condition, the effects of which would occur in the future.

■ ¶ 29 An examination of these asserted present conditions reveals their prospective or contingent nature—an investor (Choi) had committed to invest a significant sum *in the near future*; Futech had secured an underwriter who *would* help raise capital *in the near future*; Futech was pursuing a private placement *offer*; the company would become a publicly traded company *when the S–4 was approved which would be imminent*; and Futech might not need to draw on the line of credit. It is difficult to see these as anything but "statements or representations as to the future value or profitableness or prospects of a business," which cannot form the basis of a claim for fraud. *Law*, 47 Ariz. at 5, 53 P.2d at 66. Thus, the statements pertaining to Futech's financial prospects could not support Dawson's fraud claim.

■ ¶ 30 Nonetheless, the record reflects that a critical element of the loan negotiations involved the security interest Dawson would receive in the loan agreement. The loan agreement itself states that all loans, except those made or guaranteed by Withycombe, were subordinate to Dawson's loan. This, of course, was not true, since the defense expert explained that Republic Bank, Goett and Goett and Turner jointly had loans to Futech which were senior to those of both Withycombe and Dawson and secured by Futech's assets. Misrepresentations as to the priority of Dawson's security interest constituted representations as to the present status of that security interest, and therefore were actionable misrepresentations.

### 2. Goett's Awareness of Falsity

¶ 31 Turner argues there was insufficient evidence to support a finding that the "speaker" was aware of the falsity of his misrepresentation. While Turner argues there was no evidence showing Rosepink may have been aware of any misrepresentation, he does not claim that Goett did not act with knowledge of this particular fact.

■ ¶ 32 Even if this argument was preserved for appeal[7], such argument fails on this record. To maintain a claim for fraudulent misrepresentation, the claimant must demonstrate the speaker's knowledge of the falsity of the statement. *Wells Fargo Credit Corp. v. Smith*, 166 Ariz. 489, 494, 803 P.2d 900, 905 (App.1990). The record amply demonstrates that Goett had procured a good deal of Futech's financing, and was actively involved in its financial affairs. From this fact, the jury could have inferred that Goett was well aware at the time the loan agreement was drafted that there were encumbrances on Futech's assets that would not be subordinate to Withycombe's or Dawson's security interests as guaranteed in the loan agreement. Indeed, Goett was the holder of some of those security interests. Thus, the court did not abuse its discretion in denying Turner's motion for a new trial on the grounds that there was no showing Goett was aware of the falsity of his representations with regard to Dawson's security interest.

### 3. Reliance

■ ¶ 33 Turner and Withycombe argue that there is insufficient evidence to show that Dawson rightfully relied upon Goett's representations. Reliance is an essential element of a claim for fraud. *Carrel v. Lux*, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966). Dawson testified that he wanted all Futech's assets as security when he was making the loan, and that Rosepink and Goett had told him that he would have a security interest just behind those affiliated with Withycombe's loan and guaranty in order to procure the loan. Further, Rosepink testified that Dawson made it clear during the loan negotiations that he wanted the same security interest as Withycombe and to be second in priority only to Withycombe, and that the loan documents ultimately reflected that. Thus, there is at least circum-

---

7. Turner did not raise this issue in the superior court as part of his initial motion for judgment as a matter of law. Rather, he raised it only in his post-verdict motion for judgment as a matter of law and for new trial.

stantial evidence showing that Dawson relied in part on representations of his security interest priority in making the loan.[8]

¶ 34 Mere reliance is not enough to support a claim for fraud; Dawson was required to show that he had the right to rely upon the representations. *Carrel*, 101 Ariz. at 434, 420 P.2d at 568. A person may rightfully rely upon a misrepresentation of fact even when he may have discovered the falsity of the statement by a simple investigation. *Id.* at 435, 420 P.2d at 569 (citing Restatement (Second) of Torts § 540 (1977)); *Standard Ins. Agency v. Northeast Rapid Transit Co.*, 40 Ariz. 408, 415, 12 P.2d 777, 779–80 (1932). A person may not, however, rely upon a misrepresentation that is obviously false. Restatement (Second) of Torts § 541 (1977). *See also Law*, 47 Ariz. at 11, 53 P.2d at 68 (unfulfilled promise to deposit bond in borrower's account before borrower's discharge of funds not rightfully relied on when borrower did not ascertain deposit prior to disbursing funds).

¶ 35 Turner and Withycombe argue Dawson had no right to rely on any representation pertaining to the priority of his security interest because Futech had provided him with information as to senior liens before the loan was made. Dawson admitted at trial that he received a copy of a 1999 Futech investor presentation in the scope of due diligence, and an unaudited consolidated balance sheet, dated December 31, 1998. These documents indicated loans and payables by lenders other than Withycombe, including a bank loan for $7.9 million. Although the evidence indicates Dawson had notice of the existence of other loans, it is not clear from this fact whether there were security interests associated with those loans, or the priority of those security interests relative to the security interests Withycombe possessed. Moreover, once a party requests assurances, the alleged tortfeasor cannot misrepresent such assurances and then contend the alleged victim had no right to rely on such representations. *Cf. Lutfy v. R.D. Roper and Sons Motor Co.*, 57 Ariz. 495, 506, 115 P.2d 161, 166 (1941) (court will not enforce agreement waiving reliance on representations or omissions which waiver is induced by fraud or misconduct). To hold otherwise would be to allow a party to be free from the consequences of his own misrepresentations. *Id.* Thus, whether the representations pertaining to Dawson's security interest were obviously false is not indisputably established in the record. Accordingly, the jury's finding that Dawson rightfully relied upon Goett's misrepresentations bears some support in the record.

¶ 36 There is sufficient evidence in the record to support Dawson's claim that Goett knowingly misrepresented the priority of Dawson's security interest to induce Dawson to make the loan, and that Dawson rightfully

---

8. Dawson also testified that he was not concerned about other liens on Futech's assets, instead believing that the loan would ultimately be repaid. While this would indicate Dawson did not in fact rely upon representations of his priority position in the event of default, the evidence indicating he did is sufficient to affirm on this issue. *Shoen*, 191 Ariz. at 65, 952 P.2d at 303; *Styles*, 185 Ariz. at 450, 916 P.2d at 1166.

Turner points to other evidence that he claims shows Dawson knew or should have known that there were other secured loans senior to Dawson's line of credit. The record does not support that argument. Dawson testified he understood from the summary attached to the loan proposal that his security position was to be junior "only to the rights of Futech's asset-based lenders" and the Withycombe guaranty and loan. While that may be the case, those other "asset-based lenders" were not identified in the summary and when one turns to the loan agreement, it expressly provides that the Dawson was only to be junior to the Withycombe guaranty and loan. The final loan document expressly provides that Dawson's position was junior only to Withycombe's loan and guaranty.

Similarly, Turner points to the S–4 which was given to Dawson and lists other lenders to Futech prior in time to Dawson's line of credit. That document, however, does not indicate that such lenders had secured interests or were senior to Dawson as to any security. As the defense expert himself admitted, Dawson would have had to search Uniform Commercial Code filings to determine whether those lenders had secured interests. Even that search, however, would have not solved the problem since the loan agreement provided that "All loans made to [Futech] by anyone ... other than [Bank of America and Withycombe] are expressly made subordinate" to Dawson. This would indicate that as part of the loan agreement, Futech would be making some kind of arrangement with other lenders (including Goett and Turner) to have those loans subordinated.

relied upon that representation and made a loan that he did not recover. Thus, the superior court did not err by denying Turner's and Withycombe's motions for judgment as a matter of law and for a new trial on the issue of the underlying fraud.

### B. Principal–Agency Liability for Fraud

#### 1. Preservation of the Theory and Objections

¶ 37 Turner and Withycombe argue that, since agency liability for fraud was not clearly pled in the complaint, it should not have been presented to the jury. We need not address whether the agency theory was adequately pled under Arizona Rule of Civil Procedure 9(b) because Appellants have not contended the trial court erred in denying their motions to dismiss on that theory.[9] In any event, that issue is moot because, as Dawson points out, liability based upon an agency relationship was listed as a contested issue in the joint pretrial statement. *See Carlton v. Emhardt*, 138 Ariz. 353, 355, 674 P.2d 907, 909 (App.1983) ("The pretrial statement controls the subsequent course of the litigation otherwise modified at trial to prevent manifest injustice.").

¶ 38 Dawson argues that Turner and Withycombe waived any objections to sufficiency of the evidence and to the agency instruction. We agree that by failing to raise the agency issue in their pre-verdict Rule 50 motion, Turner and Withycombe waived any argument they were entitled to a judgment as a matter of law on the basis of insufficient evidence to support agency liability.[10] We find, however, that appellants sufficiently objected to the instruction on the grounds it was not supported by sufficient evidence and that by including such an argument in their motion for new trial, appellants preserved the argument that the instruction should not have been given because of insufficient evidence.

¶ 39 Appellants contended below that to form an agency relationship, there must be a manifestation of consent by the alleged principal to have the agent act on his behalf and consent by the alleged agent to act as such and be controlled by the principal. *State v. Superior Court, In and For Pima County*, 120 Ariz. 501, 504, 586 P.2d 1313, 1316 (App. 1978). Turner submitted a proposed instruction on control and consent. Withycombe and Turner additionally objected to the superior court's agency jury instruction in part on the ground that there was no agency relationship shown between Turner and Withycombe and Rosepink and Goett. In contrast, Dawson submitted a proposed instruction defining the liability of a principal for the acts of his agent under theories of actual and apparent authority. Dawson argued that Turner and Withycombe had delegated their responsibilities as Board members to negoti-

9. Any such argument would fail as a matter of law. Dawson explicitly alleged an agency relationship and liability stemming from that relationship, both at the end of his description of the parties and in the securities fraud section, the allegations of which were realleged in the subsequent sections of the complaint, including fraud and constructive fraud.

10. Neither appellant filed a Rule 50(a) motion for a judgment as a matter of law on the issue of sufficiency of the evidence as to agency prior to the case being submitted to the jury. By failing to do so, they could not raise that issue for the first time in their post-verdict Rule 50(b) motion. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 27, 945 P.2d 317, 338 (App.1996). Thus, on the sufficiency of such evidence, the appellants were limited to making a motion for new trial under Rule 59(a). *Singleton v. Valianos*, 84 Ariz. 51, 53, 323 P.2d 697, 699 (1958); *Smith v. Moroney*, 79 Ariz. 35, 41, 282 P.2d 470, 474

(1955). *See 9A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure*, §§ 2531, 2537 and 2539 (1997 and 2007 Supp.) (explaining different relief authorized by rules and noting that Rule 59 motion for new trial based on verdict being against weight of evidence is a mechanism permitting a party to challenge verdict when it procedurally erred in not preserving issue under Rule 50). *Cf. McCutchen v. Hill*, 147 Ariz. 401, 405, 710 P.2d 1056, 1060 (1985) (technical deficiencies in proof are not one of the eight grounds which warrant the grant of a new trial under Rule 59(a)).

For the reasons stated earlier in this section of our decision, we reject appellants' arguments that they did not know an agency theory was being presented prior to submission to the jury. We further reject Turner's contention that we can review this issue as fundamental error since he did not cite any authority for such argument. *Brown v. U.S. Fidelity and Guar. Co.*, 194 Ariz. 85, 93, ¶ 50, 977 P.2d 807, 815 (App.1998).

ate the loan, thereby forming personal agency relationships with Goett and Rosepink. The court overruled the objection and gave an instruction which did not include the consent and control elements.

¶ 40 Appellants' argument prior to trial was sufficient to put the trial judge on notice of what their objection was to the instruction based on sufficiency of evidence. Ariz. R. Civ. P. 51(a)(party objecting to instruction must state distinctly "the matter objected to and the grounds of the objection."); *S. Dev. Co. v. Pima Capital Management Co.*, 201 Ariz. 10, 19, ¶ 20, 31 P.3d 123, 132 (App.2001) (purpose of rule requiring specific objection to instruction, including sufficiency of evidence to support instruction, is to advise court of the basis of party's position so court may not be led into involuntary error). By repeating their sufficiency of the evidence argument for such instruction based on consent and control elements in their Rule 59 motion, appellants preserved their objection for appeal for purposes of a new trial.[11] *Reed v. Gershweir*, 160 Ariz. 203, 204 n. 1, 772 P.2d 26, 27 n. 1 (App.1989).

### 2. A New Trial is Needed on the Agency Theory

¶ 41 In their objections to the jury instructions and in their motion for new trial, appellants contended that an agency instruction was improper because there was no evidence that they had consented to have Goett and Rosepink act as their personal agents in negotiating the loan nor was there any evidence that Goett and Rosepink agreed to act as their agents and be controlled by them.

¶ 42 The court instructed the jury on agency liability as follows:

Plaintiff also claims that defendants Turner and/or Withycombe, as principals, are responsible for Goett and/or Rosepink's

fraud based on Goett and/or Rosepink acting as their agent having actual authority. A defendant can be held liable for the acts or omissions of Goett and/or Rosepink that the defendant actually authorized. To establish a claim for actual authority, plaintiff must prove that the following are more probably true than not true:

1. Goett and/or Rosepink's act was the kind of that they were authorized by defendant Turner and/or Withycombe to perform;

2. The act occurred substantially within the authorized time and space limit of their authority; and

3. The act was motivated at least in part by a purpose to serve defendant Turner and/or Withycombe.

If the above elements are shown, defendant Turner and/or Withycombe is liable for the actions of his agent, even if the defendant himself did not engage in unlawful conduct and had no knowledge of the agent's wrongdoing.

¶ 43 We find no evidence of a personal agency relationship between the alleged principals, Turner and Withycombe, and the alleged agents, Goett and Rosepink. As noted above, to create an agency relationship, there must be a manifestation of consent by the alleged principal to the alleged agent that the agent shall act on his behalf and subject to his control and consent by the agent to act on behalf of the principal and subject to his control. *State v. Superior Court*, 120 Ariz. at 504, 586 P.2d at 1316. While Goett and Rosepink were acting as agents for Futech, Dawson points to no evidence that in making the actionable misrepresentation to Dawson, Goett, Turner, and Withycombe understood and agreed that Goett was acting for appellants personally and subject to their personal control. Absent such evidence, we cannot make the leap

11. By not raising the issue in their opening briefs, Appellants have waived on appeal whether the agency instruction was legally complete by not including the control and consent elements. *General Motors Corp. v. Arizona Dept. of Revenue*, 189 Ariz. 86, 102, 938 P.2d 481, 497 (App.1996), *abrogated on other grounds by Valencia Energy Co. v. Arizona Dept. of Revenue*, 191 Ariz. 565, 959 P.2d 1256 (1998).

The agency instruction made clear, however, that to find Appellants liable on an agency theory, they had to have authorized the alleged misconduct by Goett and/or Rosepink. Thus, the agency instructions properly limited liability for Appellants to actions taken on their behalf and not referring to actions taken on behalf of Futech.

from Goett acting as an agent for the corporation to Goett acting as an agent for Turner and Withycombe in their personal capacities.

¶ 44 Dawson's arguments in support of finding an agency relationship are that the Board members delegated their authority to approve the terms of the loan, and that in signing the S–4 they expressly appointed Goett as an agent with the power to revise the S–4. Both of these arguments pertain to the authority and rights of Turner and Withycombe *as Board members of Futech.* These rights did not exist outside their roles *as Board members of Futech.* Thus, the members of the Board manifested their consent that Goett would act *on Futech's behalf,* and not their own and the agency relationship existed between Goett and Futech, but not between Goett and Turner and Withycombe.[12]

¶ 45 Dawson also appears to argue that by not doing anything once the loan was signed, Turner and Withycombe acquiesced in any prior imputed authorization, relying on Restatement (Second) of Agency, § 43 (1958). Certainly, if any principal knew of the actionable misrepresentation and acquiesced in it, they might be personally liable. *Bischofshausen, Vasbinder, and Luckie v. D.W. Jaquays Mining and Equip. Contractors Co.,* 145 Ariz. 204, 210–11, 700 P.2d 902, 908–09 (App.1985) (corporate directors can be personally liable for torts committed

by a corporation or an officer by virtue of their office if they "have knowledge amounting to acquiescence...."). The problem here, however, is there is no evidence appellants were aware of the misrepresentation concerning loan priorities and certainly nothing that would indicate the misrepresentations were being authorized or acquiesced in.[13]

¶ 46 Under Arizona law, a director cannot be liable without some kind of personal participation in the tort or at least acquiescence by knowledge of the tort combined with a failure to act. *See Bischofshausen,* 145 Ariz. at 210–11, 700 P.2d at 908–09 (corporate directors are not personally liable for torts committed by a corporation or an officer by virtue of their office; to "be held liable, the directors or officers must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management or supervision of the corporate affairs causing or contributing to the injury.") *Compare Albers v. Edelson Tech. Partners L.P.,* 201 Ariz. 47, 52, ¶ 19, 31 P.3d 821, 826 (App.2001) (corporate director is personally liable for fraudulent representations of his own or in which he participates even if in furtherance of the corporate business).

¶ 47 As such, Arizona law is consistent with section 1137 of Fletcher that a corporate officer or director is not liable for the torts of other officers unless he takes

---

**12.** Turner and Withycombe may not be considered to have an imputed principal-agency relationship with Goett subjecting them to liability merely *by virtue of their status* as Board members. *See* 3 William Meade Fletcher Cyclopedia of the Law of Private Corporations § 837 (2002 Rev.) ("Fletcher") (while some jurisdictions have held to the contrary, the better rule is that knowledge of corporation derived by virtue of relationship between corporation and officer or agent cannot be imputed to another officer or agent as individual). *See also Scott Imports v. Orton,* 22 Ariz.App. 354, 355, 527 P.2d 513, 514 (1974) (innocent agent not bound by knowledge of facts principal or other agent has).

Nor can we accept Dawson's contentions that appellants somehow ratified the agency relationship. Dawson contends that by authorizing Goett to negotiate the loan, Turner and Withycombe confirmed a personal agency relationship by ratifying any misrepresentation Goett may have made in the future. The record was clear

that at the May 27, 1999 board meeting, Goett had not yet negotiated the loan with Dawson. Thus, it would have been legally impossible for appellants to "ratify" known alleged misrepresentations which had not yet occurred. *Murdock–Bryant Constr. Inc. v. Pearson,* 146 Ariz. 57, 63–64, 703 P.2d 1206, 1212–13 (App.1984), *approved in part,* 146 Ariz. 48, 703 P.2d 1197 (1985).

**13.** Dawson also argues appellants acquiesced in the fraud when they learned that the Dawson loan had been obtained and did nothing. Such inaction is insufficient, however, unless there is evidence that appellants learned of the loan and knew of the actionable misrepresentation by Goett about the priority of debts. *See Ecuador Importadora–Exportadora CIA, LTDA v. ITF (Overseas Corp.),* 94 A.D.2d 113, 463 N.Y.S.2d 208, 210 (1983) (corporate officer not liable for fraud of other director unless he personally participated in the misrepresentation or had actual knowledge of it).

part in the commission of the tort by personally voting for or otherwise participating in them. *Id.* More to the point in this case is the explanation in Fletcher § 1137 at 302, that "Directors are not liable for misrepresentations made by their agent, if the agent, in fact, made them without their knowledge or instruction, and in reality deceived them as well as the shareholders." [14]

¶ 48 Dawson points to no evidence that Turner or Withycombe instructed Goett and Rosepink to act as their personal agents or that, knowing of the actionable misrepresentation, appellants acquiesced therein to amount to personal liability on an agency theory. On remand, Dawson must present evidence of a personal agency relationship between Goett and Rosepink on the one hand and Turner and Withycombe on the other beyond the mere delegation of Board functions to Goett.

### C. Aiding and Abetting

¶ 49 Turner and Withycombe argue that there was not sufficient evidence to establish liability for aiding and abetting fraud, and thus the superior court should have granted their Rule 50 motion. Specifically, they contend that there was insufficient evidence of scienter or "substantial" assistance to present that claim to the jury. They also contend that evidence of negligence, *i.e.,* what they should have known about the alleged misrepresentation, is insufficient as a matter of law to prove scienter.[15]

¶ 50 For a person to be liable for a tort for aiding and abetting it must be shown that the person knew the primary tortfeasor's conduct constituted a tort, and that the person substantially assisted or encouraged the primary tortfeasor in accomplishing the tort. *Wells Fargo,* 201 Ariz. at 485, ¶ 34, 38 P.3d at 23. As this theory of liability depends upon proof of scienter, it must be shown that the defendants knew the conduct they allegedly aided and abetted was a tort. *Id.* at ¶ 33. This knowledge may be inferred from the circumstances presented. *Id.* at ¶ 36. Actual and complete knowledge of the details of the primary tort may not be necessary in all cases; the knowledge requirement may be satisfied by showing general awareness of the primary tortfeasor's fraudulent scheme. *Id.* at 488, ¶ 45, 38 P.3d at 26.

¶ 51 There is no evidence in the record that either Turner or Withycombe were even aware of the fraudulent scheme to procure the loan. The fraudulent scheme complained of involved the terms of the loan, and assurances about the company's financial condition. The only actionable misrepresentation was the priority of the Dawson loan. There is no evidence of any communication between Turner and/or Withycombe and the primary tortfeasors, Goett and/or Rosepink, about the terms of the loan, including the priority of the loan, or any assurances that were made or would be made in order to

---

**14.** Nor can we agree with Dawson's citations of other authority to impose personal liability based on agency. Dawson cites to *Tarver v. Calex Corp.,* 125 Ohio App.3d 468, 708 N.E.2d 1041, 1051 (1998), for the principle that courts have employed traditional agency principles to impose liability on a director based upon a respondeat superior theory. In *Tarver,* however, the court was interpreting a state civil rights law imposing liability on an "employer" for sexual harassment by another employee. The court held that the defendant officer could not be held liable simply because he was an officer, but because he had knowledge concerning the alleged misconduct and failed to take statutorily required corrective action against the tortfeasor.

Dawson also relies on 3A Fletcher, § 1137 (2002 Cum.Supp.) for the principle that a director may be held liable for the acts of a lower level supervisor upon a showing the supervisor was able to commit the wrongdoing by virtue of authority or apparent authority vested in the supervisor by the director. That reference, however, refers to respondeat superior liability. This case is not an issue of pure respondeat superior liability but whether the individual director can be liable for fraudulent misrepresentations without evidence that he was aware of such misrepresentations.

**15.** Appellants also argue that since the court granted summary judgment on the negligence claim and negligence is insufficient as a matter of law to establish scienter, the court erred in admitting evidence as to whether Withycombe and Turner should have known of the alleged misrepresentation. We do not discuss the admissibility issue because we find there was insufficient evidence of scienter to submit this basis of liability to the jury. For this same reason, we do not address the "substantial" assistance prong of the parties' arguments.

procure that loan. *See Wells Fargo,* 201 Ariz. at 487, ¶¶ 37–41, 38 P.3d at 25 (general awareness of scheme to defraud established through bank's receipt of personal statements containing incorrect or inaccurate information). The only awareness established in the record on the part of Turner and Withycombe regarding the loan to Dawson was that Rosepink and Goett sought it out.

¶ 52 Dawson's primary argument that Turner and Withycombe had general awareness of the fraud is that they knew Goett was dishonest and that Futech was in poor financial condition and they nonetheless sent Goett out to procure a loan. Even assuming the truth of this statement, however, it is not sufficient to support liability on Turner and Withycombe's part for aiding and abetting. That Turner and Withycombe were aware of Futech's financial condition and of Goett's dishonest character, and were aware that he was soliciting funds from Dawson, indicates poor judgment and risky business practices. It does not, however, rise to the level of scienter required for aiding and abetting, specifically that they were *aware* that Goett *did or would in fact* use fraudulent statements as a means of procuring the loan. To infer awareness of the fraudulent scheme from Dawson's characterization of what Turner and Withycombe knew and thought is to pile inference upon inference, which stretches the evidence presented beyond the bounds of circumstantial evidence. *See State v. Riley,* 12 Ariz.App. 336, 337, 470 P.2d 484, 485 (1970) ("Circumstantial evidence is the proof of the existence of some fact from which fact the existence of the thing in issue may be legally and logically inferred."). Thus, the evidence of actual awareness of a tort was insufficient to establish liability for aiding and abetting. The superior court should have granted Turner's and Withycombe's Rule 50 motions.[16]

**D. Conspiracy**

¶ 53 Withycombe argues the superior court should have granted his Rule 50 motion because there was insufficient evidence to show an actual conspiratorial agreement. To establish liability on the basis of conspiracy, a plaintiff must show by clear and convincing evidence that the defendant and at least one other person agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means, and accomplish the underlying tort, which in turn caused damages. *Wells Fargo,* 201 Ariz. at 498–99, ¶¶ 99–100, 38 P.3d at 36–37. The conspiratorial agreement need not be express; it may be implied by the tortious conduct itself. Restatement (Second) of Torts § 876 cmt. a (1979). A conspiracy may be established by circumstantial evidence through the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances. *Mohave Elec. Coop., Inc. v. Byers,* 189 Ariz. 292, 306, 942 P.2d 451, 465 (App. 1997).

¶ 54 Assistance to the tortfeasor by itself, however, which courts often use to infer a conspiratorial agreement, may be insufficient to prove an actual agreement to participate in the conspiracy. This is because there is a qualitative difference between showing an agreement to participate in a tort (conspiracy) and a knowing action which might substantially aid the tortfeasor to commit a tort. *Wells Fargo,* 201 Ariz. at 499, ¶ 101, 38 P.3d at 37; *Halberstam v. Welch,* 705 F.2d 472, 478 (D.C.Cir.1983).

---

**16.** Dawson also argues that appellants did not object to the jury instruction on aiding and abetting, which allowed the jury to find scienter if there was general awareness of fraud. This argument does not assist Dawson. Based upon appellants' objections, the trial court deleted reference to "constructive knowledge" in the instruction, appropriately leaving the element as "actual knowledge." Moreover, the court's reference to general knowledge of the fraud must be read in context. The entire instruction as to scienter provided that to find appellants liable for the fraud, the jury had to find they "had actual knowledge of the fraud by Goett and/or Rosepink ... To establish actual knowledge of the fraud plaintiff is not required to show that a defendant had complete knowledge of all facts related to the fraud. It is enough if you conclude that a defendant has general awareness of the fraud and knew that a fraud was being committed. A defendant's knowledge of the fraud may be inferred from circumstantial evidence." That instruction still requires "actual knowledge" of a fraud. The only actionable misrepresentation dealt with loan priority and there is no evidence appellants had actual knowledge of such a misrepresentation.

¶ 55 Dawson argues that the jury could have inferred an agreement between Withycombe and Goett to obtain a loan from Dawson by fraud. Specifically, Dawson points to the May 12, 1999, meeting between Withycombe and Goett in which Withycombe obtained an agreement to be released from the $7 million guaranty. Dawson argues that, given the results of this meeting, Withycombe's subsequent meeting with Dawson in which he made positive comments about Futech, Withycombe's vote authorizing Goett to obtain the loan from Dawson, and evidence that Withycombe was aware Goett had a history of misrepresenting facts to obtain financing for Futech, the jury could have inferred an agreement between Goett and Withycombe to procure the loan from Dawson by misrepresentation.

¶ 56 While a trier of fact often has to infer an actual agreement to participate in the tortious conduct, such an inference should be based in part on the relationships between the actors and the actions (the proximity in time and place of the acts and the duration of the actors' joint activity) before drawing such an inference. *Halberstam*, 705 F.2d at 481. Mere suspicious cooperative activity between the alleged conspirators may not amount to clear and convincing evidence of an actual agreement to participate in the tortious conduct. *Wells Fargo*, 201 Ariz. at 499, ¶ 100, 38 P.3d at 37; *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537–39 (6th Cir.2000). In *Wells Fargo*, that the bank and the tortfeasor's agents had discussed a potential foreclosure and the tortfeasor's inflated asset statement combined with the bank's interest in painting a rosy picture of the tortfeasor's financial situation to permit a replacement loan by trust funds, was insufficient as a matter of law to prove the bank conspired with the tortfeasor. 201 Ariz. at 479–82, ¶¶ 1–11 & at 499, ¶ 100,

38 P.3d at 17–20 & 37. Similarly, in *Leahey*, evidence that a bank knew that a borrower was inflating its net worth to obtain surety bonds by having proceeds from a bank loan placed in its account at the end of the month to be withdrawn several days later, while sufficient to prove aiding and abetting in a fraud, was insufficient to meet the higher standard of an agreement to participate in the fraud. 219 F.3d at 526–27 & 537–39.

¶ 57 We think Dawson's reliance on events leading to the procurement of the loan falls short of the clear and convincing evidence needed to prove that Withycombe reached an actual agreement with Goett to defraud Dawson. Dawson characterizes the May 12 agreement to absolve Withycombe from liability for his previous $7 million guaranty [17] as involving a $2 million loan from himself and a $5 million loan from Dawson. All evidence pertaining to that agreement, however, indicates Withycombe's release from liability would result from a release of his guaranty, and not that the original $7 million loan would be satisfied by the funds from the new loans. Instead, the evidence overwhelmingly indicates that the infusion of the additional $2 million loan from Withycombe was consideration for the agreement to release Withycombe as guarantor of the earlier $7 million bank loan. On the other hand, there is no evidence, circumstantial or otherwise, that would connect the agreement with the procurement of the loan from Dawson.[18]

¶ 58 Additionally, while Withycombe did have lunch with Dawson shortly after this meeting, that lunch was at Dawson's invitation, and his comments about Futech were in response to Dawson's questions. Reliance upon Withycombe's vote authorizing Goett to obtain a loan from Dawson at the May 25 Board meeting to support a conspiratorial agreement between Goett and Dawson ig-

17. It is of little consequence to this analysis whether Futech in fact had the authority to release Withycombe from his guaranty. The evidence indicates Withycombe in fact believed he would be released from his guaranty during the time of the alleged conspiratorial agreement, and therefore the potential release would tend to make the fact of his agreement more probable.

18. Withycombe's notes and testimony about that meeting are consistent with that conclusion. That evidence reflects a variety of options which might lead to the release of his obligation, including the private placement, an ultimate investment by Dawson or a loan by Dawson. Nothing in that evidence shows an agreement to pay off Withycombe's loan or release his guaranty based on the proceeds of Dawson's loan.

nores that their votes easily may have been overridden by the other Board members. Regardless of the ultimate result of that meeting, the evidence does not support Withycombe's vote at that meeting as part of a conspiracy with Goett rather than just fulfilling his duty as a director to seek an infusion of short-term capital.

¶ 59 The underlying assumption that would connect the above events as circumstantial evidence of a conspiracy is Withycombe's purported knowledge that Goett had procured financing from him by dishonest means and that Goett was negotiating more financing from Dawson. Dawson contends this is evidence of Withycombe's agreement that Goett should procure further funding by fraudulent means. The testimony and memoranda related to the meetings between Withycombe and Turner, and then Withycombe and Goett, could be seen as implying that Withycombe believed Goett had misled Withycombe to obtain financing from him. Like *Wells Fargo* and *Leahey,* however, such knowledge is insufficient to prove by clear and convincing evidence an actual agreement between Withycombe and Goett that Goett should use dishonest means to obtain financing from Dawson. *See Kent K. v. Bobby M.,* 210 Ariz. 279, 284–85, ¶ 25, 110 P.3d 1013, 1018–19 (2005) (clear and convincing evidence is a heightened standard of proof indicating the fact is highly probable or reasonably certain).

¶ 60 Given that there was no clear and convincing evidence of an actual conspiratorial agreement by Withycombe and Goett that the loan should be procured from Dawson by fraudulent means, the issue should not have been presented to the jury. Withycombe's motion for judgment as a matter of law should have been granted.[19]

### E. Constructive Fraud

¶ 61 Turner and Withycombe appeal the verdict of constructive fraud on the grounds that the jury instructions on the business judgment rule and on directors' duties to creditors were insufficient. They further argue that the verdict finding them liable to Dawson as a creditor for constructive fraud is legally erroneous based upon the duties and privileges of corporate directors. Accordingly, they argue the court should have granted their combined Rule 50 and 59 motions.

#### 1. Jury Instructions.

¶ 62 Appellants claim that the jury instructions as to constructive fraud were erroneous because they: (1) contained no definition of fiduciary duty or fiduciary relationship; (2) did not define the scope of such a duty; (3) failed to clarify that any such fiduciary duty ran to all Futech creditors and not just individually to Dawson; and (4) failed to explain that a director's duty when the corporation approached insolvency is to avoid engaging in preferences harmful to either the corporation or to the entire creditor group.

¶ 63 We review jury instructions as a whole to determine whether the jury has been given the proper rule of law to apply when coming to a decision. *Durnin v. Karber Air Conditioning Co.,* 161 Ariz. 416, 419, 778 P.2d 1312, 1315 (App.1989). We will not overturn a jury verdict on the grounds of an erroneous instruction unless there is substantial doubt as to whether the jury was properly guided in its decision. *Id.*

¶ 64 A close review of the record reflects that appellants did not properly assert these objections below and therefore they are waived on appeal. Ariz. R. Civ. P. 51(a); *AMERCO v. Shoen,* 184 Ariz. 150, 161, 907 P.2d 536, 547 (App.1995).

¶ 65 The trial court drafted instructions to be discussed with counsel. Those draft instructions did not expressly define fiduciary

---

19. In so holding, we observe without deciding that such an alleged conspiracy between Goett and Withycombe may have been legally impossible as an intra-enterprise conspiracy. *See, e.g.,* Robin Miller, *Construction and Application of "Intracorporate Conspiracy Doctrine" as Applied to Corporation and its Employees—State Cases,* 2 A.L.R.6th 387, §§ 5 & 8 (2005) (employees of corporation cannot conspire as matter of law unless serving independent personal stake). *See also, Harp v. King,* 266 Conn. 747, 835 A.2d 953 (2003) (employees of enterprise cannot conspire as a matter of law unless they acted for their own personal purposes and not those of the corporation).

duty or relationship, the scope of such duty, that the duty ran to all Futech creditors or what the duty was to the creditors at the time of insolvency. In settling the instructions, Turner raised no objections except to join in Withycombe's comments. Withycombe argued that the draft instructions had to state that the duty as of August 4, 1999, ran to Futech creditors "as a whole" and not just to Dawson individually. Both Dawson and the court agreed and the court stated it would add a sentence that the duty ran to "all creditors." Appellants did not object to that statement and the court's final instruction as to that issue provided that "after August 4, 1999, but not before, defendants Withycombe and Turner owed plaintiff a fiduciary duty because he was a creditor of Futech. The board of directors owed a fiduciary duty to all creditors of Futech."

¶ 66 The only other objections relevant to the issues raised on appeal as to these instructions dealt with the nature of the fiduciary duty owed by the directors. Those objections dealt with whether the directors acted in good faith if they relied on information given to the directors by Goett when such reliance might not have been warranted. The objections also dealt with whether the directors were entitled to a presumption they acted in good faith if they had a conflict of interest. Ultimately the court stated that it was simply going to use A.R.S. § 10–830 (2004) on the reliance issue and that, subject to further discussion, it intended not to address the issue of presumption of good faith being lost on a conflict of interest. The court then asked if there was anything else which

was objectionable on constructive fraud and appellants stated there was not. Ultimately, the court's final instruction on the issue of a fiduciary duty and the business judgment rule incorporated the discussion above, followed A.R.S. section 10–830 and incorporated several changes based on proposed instructions from Turner on fiduciary duty.

¶ 67 To the extent we understand appellants' contentions on appeal as to the nature and scope of fiduciary duty and the duty on Futech entering the zone of insolvency, the record does not show that appellants preserved such objections below. The court went through its draft instructions with appellants as they dealt with constructive fraud and the business judgment rule, discussed how it would modify the draft in light of the objections and the parties' proposed instructions and asked if there were any objections to those changes. Appellants did not raise any further objections to the draft and modified instructions, thus waiving any further objection on appeal.[20] To the extent the parties asked the court to instruct the jury that the fiduciary duty to creditors upon the corporation entering the zone of insolvency was owed to all creditors, the court did so and the parties did not object to the proposed modified instruction. Given that failure, they cannot now object to the instruction for the first time on appeal. *See McDowell Mountain Ranch Land Coalition v. Vizcaino*, 190 Ariz. 1, 5, 945 P.2d 312, 316 (1997) (parties may not raise argument for first time on appeal).

---

**20.** Turner contends in part that he proposed draft instructions which further defined the fiduciary duties owed by directors and outside directors. Turner indeed did so. His proposed jury instruction as to the division of responsibility between management and directors and the directors' duties under section 10–830, were incorporated into the final instructions. His proposed instructions on the limited role of outside directors and duties on reaching the zone of insolvency were not adopted by the court. Turner, however, did not object to their omission during the settling of jury instructions, thus waiving any objection to their admission on appeal. *See Maxwell v. Aetna Life Ins. Co.*, 143 Ariz. 205, 211–12, 693 P.2d 348, 354–55 (App.1984) (party's general objection to refusal to give all proposed instructions did not preserve for appeal

court's refusal to give a particular requested instruction); *Flieger v. Reeb*, 120 Ariz. 31, 34, 583 P.2d 1351, 1354 (App.1978) (party waived issue on appeal when it did not comment on court's proposed instruction when asked if there were any additions or corrections needed).

We decline to assess this issue under fundamental error review, as urged by Turner. Turner has failed to provide any substantive argument in support of applying fundamental error review to this case. *State Farm Mut. Auto. Ins. Co. v. Novak*, 167 Ariz. 363, 370, 807 P.2d 531, 538 (App.1990) (legal issue in brief deemed abandoned when not supported by authority or argument). *See also Romero v. Southwest Ambulance*, 211 Ariz. 200, 204, ¶ 7 n. 3, 119 P.3d 467, 471 n. 3 (App.2005) (doctrine of fundamental error used sparingly, if at all, in civil cases).

¶ 68 Although Turner and Withycombe also assign error to the superior court's instruction on the business judgment rule, they provide no argument in support of this alleged error. We therefore deem that argument abandoned and do not address it. *Novak,* 167 Ariz. at 370, 807 P.2d at 538.

### 2. Sufficiency of evidence of constructive fraud.

¶ 69 Appellants argued in their Rule 50 motions that there was insufficient evidence to support submitting the constructive fraud claim to the jury and to support the jury verdict on that claim. Appellants claim that the court erroneously denied those motions because their duties to creditors on Futech entering the zone of insolvency were limited, that there was no evidence supporting their breach of those duties and no evidence that Dawson ever relied on any of their actions or failures to act after the loan agreement was signed making Dawson a creditor. For the reasons that follow, we agree there was insufficient evidence to support a jury verdict on constructive fraud and vacate the judgment on that ground.

¶ 70 The Delaware Chancery Court has explained the majority view on the duties of a director when a corporation is insolvent:

When a firm has reached the point of insolvency, it is settled that ... the firm's directors are said to owe fiduciary duties to the company's creditors. This is an uncontroversial proposition and does not completely turn on its head the equitable obligations of the directors to the firm itself. The directors continue to have the task of attempting to maximize the economic value of the firm. That much of their job does not change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.

*Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 790–91 (Del.Ch.2004) (internal citations and notes omitted).

¶ 71 At the same time, Arizona recognizes the trust fund doctrine, under which all assets of a corporation are considered to exist for the benefit of all its creditors when a firm reaches insolvency. *A.R. Teeters & Assos., Inc. v. Eastman Kodak Co.,* 172 Ariz. 324, 331, 836 P.2d 1034, 1041 (App.1992). As a result, no liens or rights may be created either voluntarily or legally that would give one creditor an advantage over another. *Id.* Once a corporation becomes insolvent, the creditors join the class of persons to whom directors owe a fiduciary duty to maximize the economic value of the firm for the benefit of *all* the firm's creditors.[21]

¶ 72 Constructive fraud is "a breach of legal or equitable duty which, without regard to moral guilt or intent of the person charged, the law declares fraudulent because the breach tends to deceive others, violates public or private confidences, or injures public interests." *Lasley v. Helms,* 179 Ariz. 589, 591, 880 P.2d 1135, 1137 (App. 1994). While it does not require a showing of intent to deceive or dishonesty of purpose, it does require a fiduciary or confidential relationship. *Id.* at 592, 880 P.2d at 1138. Most importantly for our purposes, the breach of duty by the person in the confidential or fiduciary relationship must induce justifiable reliance by the other to his detriment. 37 Am.Jur.2d *Fraud and Deceit* § 9 (2001); *Assilzadeh v. Cal. Fed. Bank,* 82 Cal.App.4th 399, 98 Cal.Rptr.2d 176, 187 (2000). *See also In re McDonnell's Estate,*

---

21. Dawson makes much of expert testimony presented by Turner and Withycombe indicating that the Board owed a fiduciary duty to Dawson after the date the loan was consummated. That testimony does not explicitly state that the duty was owed to Dawson individually. More impor-

tantly, as the scope of the Board's fiduciary duty is a question of law, we are not bound by expert testimony thereon. *See Hafner v. Beck,* 185 Ariz. 389, 393, 916 P.2d 1105, 1109 (App.1995) (expert witness may not create duty through opinion when law does not recognize such duty).

65 Ariz. 248, 252, 179 P.2d 238, 241 (1947) (difference between actual and constructive fraud is that former requires actual intent to deceive while other is characterized as breach of a duty actionable irrespective of moral guilt and arising out of a confidential relationship); *Walk v. Ring*, 202 Ariz. 310, 319, ¶ 35 and n. 6, 44 P.3d 990, 999 and n. 6 (2002) (breach of fiduciary duty by fraudulently concealing treatment errors tolls statute of limitations until concealment is discovered or reasonably should be discovered or presumably until plaintiff had actual knowledge of underlying mistreatment).[22]

¶ 73 Turner and Withycombe argue that they did not have a fiduciary duty to Dawson individually. Rather, they argue, they had a fiduciary duty to the body of creditors of Futech. Thus, they contend, to assert a breach of fiduciary duty in support of a claim of constructive fraud, Dawson would have to show that Turner's and Withycombe's acts or omissions breached their fiduciary duty to the creditors as a whole.

■ ¶ 74 As noted above, when a firm is insolvent, creditors are included in the class of persons to whom a board of directors owes a fiduciary duty. *Production Resources*, 863 A.2d at 790–91. This does not change the primary object of their duties—to maximize the value of the firm for the benefit of the interested parties—but merely shifts the constituency that is interested in any derogation from that primary object. *Id.* at 792. The fiduciary relationship is not personal; it is derived from the corporate form, which exists for the benefit of the creditors as a class when the firm is insolvent.[23] *Id.; A.R. Teeters*, 172 Ariz. at 331, 836 P.2d at 1041.

■ ¶ 75 Any breach of the fiduciary duty arising from Turner's and Withycombe's relationship to Dawson as a creditor of Futech, then, must have involved an act or omission that harmed the assets or value of Futech that occurred at some point after the loan was consummated. Dawson argued at trial, and reasserts on appeal, that Turner and Withycombe breached their duties as directors by allowing Goett to continue as CEO and chairman of the Board, and by failing to curtail his control over the financial affairs of the corporation. In support of this, Dawson presented an expert witness at trial who testified that, based upon Goett's previous handling of Futech's financial affairs, upon learning that Futech had been infused with the $5 million line of credit, Turner and Withycombe should have "stormed the corporate office" and taken over management of Futech's finances to ensure the funds were beneficially expended. Although there was also testimony by another expert that it was better business practice under the circumstances to leave Goett in place, a reasonable person could have found, based on this evidence, that Turner and Withycombe breached their fiduciary duties as Board members.

■ ¶ 76 This, however, does not end our inquiry. To establish a claim for constructive fraud based upon the failure of Turner and Withycombe to take over Futech's financial affairs, Dawson had to show that he relied upon that failure to his detriment. *Assilzadeh*, 98 Cal.Rptr.2d at 187. Dawson has made no argument as to how he relied upon Turner's and Withycombe's omissions in taking on traditional Board functions to his detriment. The bulk of Dawson's argument vis-à-vis reliance on Turner's and Withycombe's alleged omissions is that he did not halt the line of credit because he was not alerted that there was not adequate financing to repay the loan by the due date. As noted above, because the fiduciary duty was not personal to Dawson, the Board's duty to Futech's creditors did not encompass a personal duty to Dawson to inform him of the status of his loan. Dawson makes no attempt to connect the Board's failure to exercise further diligence in managing Futech's financial affairs with this alleged reliance.

---

22. The jury instructions include a reliance element because they refer to the fact that to hold defendants liable on this count, the jury would have to find that the 'breach of the duty deceived plaintiff.' One cannot be deceived if one did not rely on something.

23. Dawson's argument that the failure of Turner and Withycombe to approach him and inform him that the line of credit would not be repaid so that Dawson could recover his funds misconstrues the thrust of the fiduciary duty in this case.

Thus, Dawson's argument concerning reliance fails.

¶ 77 Given this lack of evidence, the court should have granted Turner's and Withycombe's motions for judgment as a matter of law on constructive fraud.[24]

## II. Issues on Cross–Appeal

¶ 78 On cross-appeal, Dawson contends the court erred in granting summary judgment on Dawson's claim for negligence and punitive damages and erred in calculating prejudgment interest. We address these issues to assist the court on remand.

### A. Negligence

■■■ ¶ 79 Dawson argues the superior court's entry of summary judgment was error because Turner and Withycombe had a duty to him not to act negligently in supervising Goett and Rosepink in connection with obtaining a line of credit. The superior court granted summary judgment on Dawson's claim for negligence, finding that Turner and Withycombe owed no duty to Dawson as a prospective creditor such that Dawson could personally maintain a negligence claim against them. We affirm the trial court on this issue.

¶ 80 In the superior court, appellants contended they were entitled to summary judgment because as directors they had no personal duty to Dawson as a potential creditor and he had conceded that he had not relied on anything they had done or failed to do once he became a creditor. They also argued that they could not be personally liable because they did not know of the alleged misrepresentations by Goett or Rosepink. In response, Dawson contended that directors are personally liable for negligent supervision of corporate employees if such negligence caused an injury to third persons and that the directors were not protected by the business judgment rule for such negligence. Dawson did not dispute that he had not been injured because of any reliance he had placed on appellants actions or failures

to act after the loan agreement had been reached.

¶ 81 On appeal, Dawson contends appellants could be liable as a matter of law because of negligent supervision. He argues that there is a general duty to act reasonably for persons facing a foreseeable risk and a general duty to disclose material facts dealing with a commercial transaction. In response to appellants' arguments, Dawson states he does not need to rely on any duty to him as a potential creditor.

¶ 82 In reviewing a summary judgment, we view the evidence in the light most favorable to the opponent of the motion. *Andrews v. Blake,* 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003). Summary judgment is warranted if the evidence presented by the party opposing the motion has so little probative value that reasonable jurors could not agree with his conclusions so that the movant is entitled to a judgment as a matter of law. *Washburn v. Pima County,* 206 Ariz. 571, 574, ¶ 4, 81 P.3d 1030, 1033 (App.2003); *United Bank of Arizona v. Allyn,* 167 Ariz. 191, 195, 805 P.2d 1012, 1016 (App.1990). We review de novo both whether there is a genuine dispute of material fact and whether the trial court erred in applying the law. *Washburn,* 206 Ariz. at 574, ¶ 4, 81 P.3d at 1033.

■■■ ¶ 83 We agree with the trial court that on this record appellants had no duty owing to Dawson to properly supervise Goett. Given Dawson's concession that he does not rely on any post-loan conduct or omissions to assert a negligence claim, we look only at whether appellants had a duty to Dawson as a potential creditor. A necessary element of any negligence claim is the existence of a duty. *Wells Fargo,* 201 Ariz. at 483, ¶ 20, 38 P.3d at 21. Dawson points to no case providing that a corporate director has an affirmative duty to protect potential creditors from alleged misrepresentations by corporate employees.

¶ 84 Dawson attempts to find such a duty based on general liability theories. His premise is that corporate directors can be

---

24. Withycombe also argues the superior court erred by refusing to grant remittitur on the damage award as to him. This issue is moot because we are vacating the judgment and remanding for a new trial.

liable for the torts of the corporation or a corporate agent if the directors "partici-pate[d] or [had] knowledge amounting to ac-quiescence or [were] guilty of negligence in the management or supervision of the corpo-rate affairs causing or contributing to the injury." *Bischofshausen*, 145 Ariz. at 210–11, 700 P.2d at 908–09. He then contends that corporations have a duty to fairly dis-close material facts to third parties entering into commercial transactions with the corpo-ration. Thus, he argues that since the corpo-rations have such a duty and a director can be liable for failure to properly supervise employees failing to make such fair disclo-sure, the directors have a duty to the third party for any harm caused by the misrepre-sentation or failure to disclose.

¶ 85 This lack of a duty to potential creditors does not mean, however, that sim-ply because a director is dealing with a po-tential creditor, there is no duty whatsoever. As noted above, under some circumstances there may be a duty to disclose certain mate-rial facts under Restatement (Second) of Torts § 551. In those cases, however, for personal liability to attach, the involvement of the directors must be more direct and not simply based on failure to properly supervise corporate employees. As explained in 3A Fletcher, § 1137 at 302, "Directors are not liable for misrepresentations made by their agent, if the agent, in fact, made them with-out their knowledge or instruction, and in reality deceived them as well as the share-holders." Unless the director participates in the fraud by knowingly approving or ratify-ing unlawful acts, there is no liability. *Id.* at 303. *Accord, id.,* §§ 1146–47 at 348 & 355. *Cf., 3A Fletcher* § 1135 at 291 ("[D]irectors of a corporation do not owe a fiduciary duty to third parties, and cannot be held liable for an omission of duty to a third party for harm resulting from acts done on behalf of the corporation.").

¶ 86 None of Dawson's authorities support a more expansive duty to potential creditors. *Jabczenski v. S. Pac. Mem'l. Hosps., Inc.,* 119 Ariz. 15, 20, 579 P.2d 53, 58 (App.1978),

dealt with an intentional conversion of funds owed to employees approved by the board. *Bischofshausen* dealt with personal injuries in the mining of asbestos in which there were facts the defendant officer had personally authorized in running the company. 145 Ariz. at 210–11, 700 P.2d at 908–09. *S Devel-opment Co.* 201 Ariz. at 14–15, ¶¶ 7–8, 31 P.3d at 127–28, adopted the rule in Restate-ment (Second) of Torts, § 551(2)(e) that a party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is con-summated

facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*S Development* did not deal with prospective creditors of a company nor did it deal with directors' personal liability for any failure to disclose. Nor did Dawson present a genuine dispute that appellants knew Dawson was acting under a mistake of facts or that there were other objective circumstances under which Dawson would have reasonably expect-ed a disclosure of such material facts.[25]

¶ 87 Dawson's reliance on various federal cases fares no better. Both *Resolution Trust Corp. v. Blasdell,* 930 F.Supp. 417, 419–20 (D.Ariz.1994), *disagreed with on other grounds, F.D.I.C. v. Jackson,* 133 F.3d 694, 698 & 700 (9th Cir.1998) (applying Arizona law) and *Resolution Trust Corp. v. Dean,* 854 F.Supp. 626, 630 & 635–37 (D.Ariz.1994), dealt with claims of negligent supervision against directors brought not by potential creditors who claimed the banks and di-rectors made misrepresentations, but by the RTC as receiver or conservator of the insti-tutions on behalf of the institution and its shareholders and depositors. *Kearns v. Tempe Technical Inst., Inc.,* 993 F.Supp. 714, 724–26 (D.Ariz.1997), did find that summary judgment for corporate directors was inap-propriate if they failed to monitor another

---

**25.** Dawson's reliance on *Lombardo v. Albu,* 199 Ariz. 97, 99–100, 14 P.3d 288, 290–91 (2000), is also misplaced. *Lombardo* simply dealt with an

agent's duty to make fair disclosure even if the principal desires not to. It has no relevance to the facts and claim here.

employee's recruiting efforts. It did not address, however, whether there was any duty owing to the plaintiffs, students who had enrolled in the institute under allegedly false pretenses.

¶ 88 Given the lack of any personal duty from appellants to Dawson as a potential creditor, the court did not err in entering summary judgment on Dawson's negligence claim.

## B.  Punitive Damages

¶ 89 Dawson argues the superior court erred in granting summary judgment on his claim for punitive damages. The court found that Dawson had "failed to establish clear and convincing evidence of evil motives or willful and wanton disregard of the interest of the others." We find no error.

¶ 90 When the superior court decides a motion for summary judgment on the availability of punitive damages, such motion:

> must be denied if a reasonable jury could find the requisite evil mind by clear and convincing evidence. Conversely, the motion should be granted if no reasonable jury could find the requisite evil mind by clear and convincing evidence. Because in granting or denying such a motion the judge is not a fact finder, the evidence and all reasonable inferences that may be drawn from the evidence should be construed in a light most favorable to the non-moving party.

*Thompson v. Better–Bilt Aluminum Prods. Co., Inc.,* 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992).

¶ 91 We reject Dawson's arguments for two reasons. First, in his opening brief on cross-appeal, Dawson does not claim that the trial court erred in granting summary judgment on punitive damages based on agency liability. Dawson only raises this issue in his reply brief. We will not consider arguments made for the first time in a reply brief. *Muchesko v. Muchesko,* 191 Ariz. 265, 268, 955 P.2d 21, 24 (App.1997). Since we have held the jury could not have found appellants liable on aiding and abetting, conspiracy or constructive fraud, any claim for punitive damages on those theories is moot and Dawson has waived his argument on agency liability for punitive damages by not raising it in his opening brief.

¶ 92 Second, Dawson's agency argument in his reply brief fails on the merits. Any argument for punitive damages against a principal based on the acts of an agent fails if the conduct of the agent does not rise to the level meriting punitive damages. *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 184 Ariz. 120, 129–31, 907 P.2d 506, 515–17 (App.1995); *Walter v. Simmons,* 169 Ariz. 229, 240–41, 818 P.2d 214, 225–26 (App. 1991). *See also Wiper v. Downtown Dev. Corp. of Tucson,* 152 Ariz. 309, 311, 732 P.2d 200, 202 (1987) (if no punitive damages are awarded against the employee, none may be awarded against the employer by vicarious liability).

¶ 93 Thus, to avoid summary judgment on this issue for agency purposes, there must have been a genuine dispute of material fact whether punitive damages could have been awarded against Goett. We hold that the evidence at summary judgment precluded such a finding.

¶ 94 Punitive damages may be warranted upon a showing that the defendant was consciously aware of the wrongful or harmful nature of his conduct and nonetheless persisted in that conduct in deliberate contravention to the victim's rights. *Thompson,* 171 Ariz. at 556, 832 P.2d at 209. The intent or deliberate indifference required to justify the additional imposition of punitive damages is focused on the harm to the plaintiff. *Id.* This is distinct from the intent required to establish many intentional torts. *See Rawlings v. Apodaca,* 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986) ("the species of intentional conduct necessary for recovery of tort damages in a bad faith case may fall short of what is required for a punitive damage award. In this as in other torts, both intentional and unintentional, punitive damages are only recoverable under special circumstances.") [26]

---

**26.**  For example, the intent required to establish

agency liability for fraud in this case was direct-

¶ 95 On the record presented at summary judgment, a reasonable jury could not have found by clear and convincing evidence that Goett was consciously aware of the wrongful or harmful nature of the allegedly fraudulent statements and nonetheless made them in deliberate contravention to Dawson's rights. The record presented at summary judgment bears little if any indication of any "evil motive" on Goett's part when he made the misrepresentation to procure the loan. The bulk of Dawson's allegations with respect to Goett's state of mind when he made that statement involved Goett's knowledge of the priorities and Futech's financial condition. While this may have established the scienter required for fraud, it denotes neither conscious awareness of the harmful nature of the fraud, nor deliberate contravention with Dawson's rights. In fact, the excerpts of Goett's deposition produced by Dawson in opposition to the motion for summary judgment indicate Goett believed at the time he induced Dawson to make the loan that the loan would ultimately be repaid, even if not by the means he had indicated to Dawson, and that Futech's operational value was sufficient to satisfy the security interests ahead of Dawson's.

¶ 96 Dawson contends that fraudulent conduct by itself may justify an award of punitive damages. We think Dawson's argument extends this concept beyond the basis for punitive damages.[27] As our supreme court stated in *Rawlings*, "punitive damages are not recoverable in every fraud case, even though fraud is an intentional tort." *Rawlings*, 151 Ariz. at 162 n. 8, 726 P.2d at 578 n.

8. *Accord, Hunter Contracting Co. v. Sanner Contracting Co.* 16 Ariz.App. 239, 246, 492 P.2d 735, 742 (1972) (simple fraud without evidence of aggravated, wanton, reckless or malicious intentional wrongdoing insufficient for punitive damages). Eschewing a per se rule, we think every case must be based on its own facts and the standard of aggravated, wanton, reckless or malicious intentional wrongdoing is more consistent with the standard our supreme court has stated for an award of punitive damages:

> [an] evil hand ... guided by an evil mind which either consciously sought to damage the [victim] or acting intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the victim ... motives ... so improper, *or ...* conduct so oppressive, outrageous or intolerable that such an "evil mind" may be inferred. . . .

*Rawlings*, 151 Ariz. at 162–63, 726 P.2d at 578–79. *See also Rhue*, 173 Ariz. at 232, 841 P.2d at 227 (punitive damages warranted by evidence defendant deliberately misled and intended to injure plaintiff in breach of fiduciary duty).

¶ 97 Since the evidence presented at summary judgment did not present a genuine dispute of such conduct or intent by Goett to support an award of punitive damages against him, Turner and Withycombe could not have been held vicariously liable for punitive damages. The superior court did not err by entering summary judgment in favor of Turner and Withycombe on the issue of punitive damages.

ed at the conduct of the alleged primary tortfeasors—consent that the agent shall act on behalf of the principal in committing the fraud. The jury's finding of liability in this case does not demonstrate, as Dawson asserts, that a reasonable juror could have found punitive damages awardable to Dawson.

27. All of the cases cited by Dawson to contend fraud by itself is sufficient to award punitive damages find their basis in *Farr v. Transamerica Occidental Life Ins. Co.*, 145 Ariz. 1, 8, 699 P.2d 376, 383 (App.1984). *See Gonzalez v. Gonzalez*, 181 Ariz. 32, 35, 887 P.2d 562, 565 (App.1994) (citing to *Gurule v. Ill. Mut. Life & Cas. Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987), which relied on *Rawlings*, 151 Ariz. at 162–63, 726 P.2d at 578–79, which in turn relied on *Farr*). See

also, *Volz v. Coleman Co., Inc.*, 155 Ariz. 567, 570, 748 P.2d 1191, 1194 (1987) (citing to *Gurule*); *Rhue v. Dawson*, 173 Ariz. 220, 232, 841 P.2d 215, 227 (App.1992) (citing to *Farr*). The statements in each of those cases that fraud is sufficient by itself to merit punitive damages are contrary to the statements in footnote 8 of *Rawlings* as well as the holding in *Hunter* and are dicta. Just as with the cases relying on *Farr*, *Farr* itself did not deal with a case of fraud, but an alleged bad-faith refusal to pay benefits under an insurance policy, with the court stating in dicta that "fraud will suffice" for an award of punitive damages, then limiting the type of fraud it meant to an insurer actually concealing the existence of a policy. *Farr*, 145 Ariz. at 8, 699 P.2d at 383.

## C. Prejudgment Interest

¶ 98 Dawson argues the superior court erred by calculating the prejudgment interest from the time the complaints were served on Turner and Withycombe, and by subtracting the amount of Rosepink's settlement before calculating the interest. While the issue of interest is now moot, it may arise again on remand and we address this issue to guide the trial court. We hold that prejudgment interest should have begun to accrue at the time the complaint was filed, but that the trial court properly reduced the amount of the judgment by the Rosepink settlement before calculating interest.

¶ 99 We review the court's calculation of prejudgment interest de novo. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 508, 917 P.2d 222, 237 (1996). In cases involving liquidated damages such as the one at bar,[28] prejudgment interest is a matter of right. *Trus Joist Corp. v. Safeco Ins. Co. of America*, 153 Ariz. 95, 109, 735 P.2d 125, 139 (App.1986). An award of prejudgment interest serves the dual purpose of recompensing the victim and deterring defendants from dilatory litigation tactics. *Trimble v. American Sav. Life Ins. Co.*, 152 Ariz. 548, 557, 733 P.2d 1131, 1140 (App.1986).

### 1. When Interest Should Have Begun

¶ 100 In those cases in which no demand has been made on the defendants, the prejudgment interest is calculated from the time the complaint was filed. *Rawlings*, 151 Ariz. 180, 186, 726 P.2d 596, 602 (App. 1985), *vacated on other grounds* 151 Ariz. 149, 726 P.2d 565. The weight of Arizona law supports the proposition that, absent a demand letter, prejudgment interest should accrue from the date the complaint was filed. *Rawlings*, 151 Ariz. at 186, 726 P.2d at 602; *U.S. Fid. & Guar. Co. v. Cal.-Ariz. Const. Co.*, 21 Ariz. 172, 193, 186 P. 502, 509 (1920) *overruled on other grounds, Schwartz v. Schwerin*, 85 Ariz. 242, 249, 336 P.2d 144, 149 (1959).

¶ 101 Despite this rule, Dawson argues interest should have been calculated from a date prior to the filing of the com-

plaint. "In cases involving unconditional money debts, prejudgment interest accrues from the date the plaintiff makes a demand." *Gemstar*, 185 Ariz. at 509, 917 P.2d at 238. Dawson argues that, as the debt in this case had a definite due date, the superior court erred by applying the rule for unconditional money debts. Under *Gemstar*, he argues, the prejudgment interest should have been calculated from the date the money came due, December 1, 1999. *See Gemstar*, 185 Ariz. at 509, 917 P.2d at 238.

¶ 102 Although this case involves a contract with a definite due date, Dawson's complaint was not for breach of contract. This case involves the alleged torts of Withycombe and Turner, neither of whom were parties to the contract, and neither of whom were alleged to have breached that contract. Thus, the due date on the contract has no bearing upon the calculation of prejudgment interest on the tort action.

¶ 103 We also reject Turner and Withycombe's contention that the court correctly calculated the prejudgment interest from the respective dates Turner and Withycombe were served with the complaints. They rely on *Alta Vista Plaza, Ltd. v. Insulation Specialists Co., Inc.*, 186 Ariz. 81, 919 P.2d 176 (App.1995), to support their argument that prejudgment interest should not be calculated until the date the defendants were put on notice of the amount owed. In *Alta Vista*, this Court determined that it would not calculate prejudgment interest from the date a non-itemized demand letter was sent to the defendants because it did not provide sufficient information on the amount owed on the liquidated portion of the plaintiff's damages. *Id.* at 83, 919 P.2d at 178. At no point in that case did the court hold that prejudgment interest should be calculated after the date the complaint was filed. We further note no subsequent decisions relying on this case for the proposition that prejudgment interest should accrue from the service of the complaint rather than the filing of the complaint.

¶ 104 Thus, the prejudgment interest should have accrued as of the filing of the

---

**28.** The parties do not dispute whether the damages here were liquidated.

complaint, and the court erred by finding that it accrued as of the service of the complaint.

### 2. Application of the Settlement

¶ 105 Finally, Dawson argues that the court erred by subtracting the amount of the Rosepink settlement before calculating the amount of prejudgment interest. When a defendant who is jointly liable for damages to a plaintiff enters into a settlement agreement with that plaintiff, the amount of the settlement is subtracted from the remaining joint tortfeasors' damage award. A.R.S. § 12–2504 (2003). Dawson does not argue the damage award should not have been reduced by the amount of the settlement, but that interest should have been calculated before such a reduction.[29]

¶ 106 As noted above, an award of prejudgment interest serves the purpose of making the plaintiff whole. *Trimble*, 152 Ariz. at 557, 733 P.2d at 1140. To allow prejudgment interest to accrue on the total amount of the judgment, even after Dawson received the settlement from Rosepink, and to subtract the amount of the settlement after adding interest to the judgment would result in a windfall to Dawson. He had presumably enjoyed the benefit of the settlement, including interest accruing or potential profit on that settlement.

¶ 107 Thus, a proper calculation of prejudgment interest would reflect accrual of interest on the total judgment from the time the complaint was filed until the time of the settlement, and then on the amount of the judgment less the amount of the settlement after the date of the settlement. *See Deocampo v. Ahn,* 101 Cal.App.4th 758, 782, 125 Cal.Rptr.2d 79 (2002).[30]

29. *Gemstar* has no bearing upon the order in which the settlement should have been subtracted from the award and the interest calculated. In *Gemstar*, neither the amount of the settlement nor prejudgment interest on that amount could have been subtracted from the damage award because liability was several. 185 Ariz. at 508–509, 917 P.2d at 237–38. Here, the liability is joint, and therefore the damages may be reduced by the amount of the settlement.

### CONCLUSION

¶ 108 For the reasons stated above, we vacate the judgment against appellants and remand for a new trial on the issue of agency liability. Upon timely compliance with AR-CAP 21, we will award Withycombe and Turner their costs on appeal and cross-appeal.[31]

CONCURRING: MAURICE PORTLEY, Presiding Judge, and PATRICK IRVINE, Judge.

30. Since we have vacated the judgment, we do not address Dawson's argument that the court made mathematical errors in computing interest.

31. Turner requests an award of attorneys' fees on appeal if we determine this matter arises out of contract. This matter does not arise out of contract and we deny such request.