NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

PAUL V., DANA B., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, L.V., R.V., *Appellees*.

No. 1 CA-JV 16-0467
FILED 6-6-2017

Appeal from the Superior Court in Mohave County
No. L8015JD201407006
The Honorable Douglas Camacho, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Paul V.*

Mohave County Legal Defender's Office, Kingman
By Eric Devany
*Counsel for Appellant Dana B.*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge James P. Beene joined.

---

**W I N T H R O P**, Judge:

**¶1**        Paul V. ("Father") and Dana B. ("Mother") (collectively, "the parents"), the biological parents of L.V. and R.V. (collectively, "the children"),[1] appeal the juvenile court's order terminating their parental rights to the children on multiple statutory grounds.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY[2]

**¶2**        The parents have a long history of domestic violence, and Father has a history of substance abuse, specifically alcohol and methamphetamines.  Mother has a lengthy history of serious mental illness, and, at times, has refused to use prescribed medications.  For both parents, these issues prevent them from properly parenting.

**¶3**        In January 2014, the parents and children lived in California.  At that time, Father called the police given Mother's threat of self harm and concerns about the safety of the children.  Police officers took Mother to a mental health facility; however, she checked herself out after twenty-four hours.  Over the next several days, the police were called to the residence multiple times due to continuing incidents between the parents.

**¶4**        After a California state court granted Father emergency temporary custody of the children, Mother took the children to Arizona to live with her parents.  The maternal grandparents then contacted Arizona's Department of Child Safety ("DCS"), which removed the children from Mother's care in late January 2014.

---

[1]      L.V. was born in November 2012; R.V. was born in September 2013.

[2]      We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010).

**¶5** DCS filed a dependency petition, alleging the children were dependent as to the parents due to numerous instances of neglect, as well as abuse on the part of Mother. The juvenile court found the children dependent and adopted a case plan of family reunification.[3]

**¶6** DCS offered the parents a wide variety of services. However, Father initially chose to stay in California, where he was briefly arrested and incarcerated, and did not engage in services or visitation. Mother participated in various services but struggled with her mental health issues, missed numerous sessions, routinely cancelled visitation, and continued to engage in domestic violence with Father when he visited her.

**¶7** In May 2014, Father moved to Arizona, was referred for services, began to inconsistently visit the children, drank alcohol with Mother, tested positive for opiates, and admitted using codeine prescribed to Mother. Mother struggled to care for or redirect the children during supervised visits, especially when attempting to care for both children or when Father was present, and she and Father often terminated visits early. Both parents also struggled to maintain stable housing and employment.

**¶8** By February 2015, Mother's mental health appeared stable, and the parents were living together in an apartment. They were able to effectively parent as a couple, but not without assistance. Also, Father had a criminal case for which he faced possible incarceration. The parents later began having weekly supervised visits in their home. Due to her mental illness, however, Mother was unable to care for the children on her own.

**¶9** In May 2015, Mother engaged in self harm and, pursuant to a psychological evaluation, was diagnosed with "Major Depressive Disorder, recurrent episodes, severe"; "Borderline Personality Disorder"; and rule-out "Bipolar II Disorder." Father also underwent a psychological evaluation, with a resulting recommendation that he engage in "individual counseling for symptoms of anxiety and depression as well as to assess further for any ongoing issues with his own anger toward others if still present," a psychiatric evaluation for a medication evaluation, couples

---

[3] Arizona's juvenile court had jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act because the court contacted the California superior court, which declined jurisdiction over the matter. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 25-1031 to -1040 (2017); *see also* Cal. Fam. Code §§ 3421 to 3430 (West 2017).

therapy, psychoeducational parenting classes, and family therapy if he were unified with the children.

¶10　　　　Between October 2014 and October 2015, Father missed over half of his required drug tests and tested positive for alcohol five times and opiates once—even while he engaged in substance-abuse treatment. He also missed nearly forty percent of his domestic violence classes. Nonetheless, by October 2015, the parents were allowed overnight weekend visits with the children, as well as twice-weekly monitored visits, and DCS eventually moved to change the children's physical custody to Father.

¶11　　　　In early December 2015, the juvenile court granted Father physical custody of the children, in part because he assured DCS that he would follow DCS's directive to not leave the children alone with Mother.[4] In February 2016, the court orally dismissed the case, and soon after, DCS lodged a formal order to dismiss.

¶12　　　　Shortly thereafter, however, Mother contacted DCS and explained that Father had relapsed on methamphetamines, was physically and emotionally abusing her, and the children were unsafe in the residence.[5] Mother sought an order of protection against Father, and she and the children moved in with the maternal grandparents with a safety plan. Father then made harassing phone calls to Mother and caused destruction at the maternal grandparents' residence, including shattering the windows and denting the trunk of Mother's car, which led to the filing of numerous police reports and a charge of aggravated domestic violence against Father. Mother refused to cease communication with Father, however, and the maternal grandparents requested that Mother vacate the residence, leaving Mother without stable housing for her and the children. Mother was referred to a domestic violence shelter, but refused to go.

¶13　　　　Father contacted DCS, expressing concerns that Mother and the children were staying at a homeless shelter. Father also filed an objection to the order to dismiss the dependency, which was joined by

---

[4]　　　A safety plan had been developed that if Father was not able to pick up the children from daycare or if one of the children were sick and unable to go to daycare, Mother would contact an approved friend or family member to stay with her and the children until Father could come home.

[5]　　　Father had also been leaving the children alone with Mother, and he subsequently tested positive for methamphetamines and opiates.

counsel for the children. DCS then moved to withdraw the dismissal, removed the children from Father, and returned them to foster care—their fourth placement in the case. A few days later, Mother came to Father's house uninvited, attempted to break in, and the parents again engaged in domestic violence. Father, who was allegedly intoxicated, choked Mother, and the police were again called. In April 2016, the juvenile court vacated its oral order dismissing the case.

¶14 Between April and August 2016, Father missed approximately one-half of his required drug tests and was arrested for a DUI after driving 104 miles-per-hour in a 55 mile-per-hour zone while intoxicated; Mother was a passenger.[6] Arizona Families F.I.R.S.T. assessed Father's condition and recommended he engage in further substance abuse treatment and domestic violence classes, but Father expressly refused both services.

¶15 Both parents missed numerous visits with the children, declined the opportunity to schedule more visits, and did not actively engage in services after the children's re-removal. Mother missed counseling sessions, took her medication inconsistently, and consumed alcohol. She also never secured stable housing for herself, and continued to stay in a relationship with Father, despite his arrest for another DUI.

¶16 On June 30, 2016, DCS moved to terminate the parents' parental rights. As to Father, DCS moved to terminate on the grounds of neglect, chronic substance abuse, nine months' out-of-home placement, and fifteen months' out-of-home placement. As to Mother, DCS moved to terminate on the grounds of neglect, willful abuse, mental illness, nine months' out-of-home placement, and fifteen months' out-of-home placement. *See* A.R.S. § 8-533(B)(2), (3), (8)(a), (c) (Supp. 2016). In the weeks before trial, Father submitted diluted urine samples—which DCS deemed positive for banned substances—and samples that tested positive for alcohol; however, he denied having a chronic substance abuse history and that his substance abuse hindered his ability to care for the children.

¶17 At the September 27, 2016 termination adjudication hearing, the juvenile court granted DCS's motion to terminate the parents' parental rights to the children. The court terminated Father's rights on the grounds

---

[6] Although Father's license was suspended, he continued to drive. DCS reported that Mother was "very unstable in her moods" and "[h]er behaviors have shown that she cannot make appropriate life choices for herself and her children to provide safety and stability."

of chronic substance abuse, nine months' out-of-home placement, and fifteen months' out-of-home placement. The court terminated Mother's rights on the grounds of mental illness, nine months' out-of-home placement, and fifteen months' out-of-home placement. The court also found the parents had received proper legal notice of the proceedings, DCS had made a diligent effort to provide appropriate reunification services, and severance was in the children's best interests.

¶18 Father and Mother each filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 8-235(A) (2014) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

### I. *Standard of Review*

¶19 "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005) (citations omitted). Even fundamental rights are not absolute, however. *Id.* (citation omitted). A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and finds by a preponderance of the evidence that severance is in the children's best interests. *See* A.R.S. §§ 8-533(B), -537(B) (2014); *Kent K.*, 210 Ariz. at 281–82, 288, ¶¶ 7, 41, 110 P.3d at 1015–16, 1022.

¶20 The juvenile court retains great discretion in weighing and balancing the interests of the children, parents, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160, 650 P.2d 459, 462 (1982). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009) (citation omitted). Thus, the resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12, 53 P.3d 203, 207 (App. 2002).

¶21 We will not disturb the juvenile court's order absent an abuse of discretion or unless no reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7, 225 P.3d at 606; *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004). We review *de novo* questions of law, including the application of a statute or rule. *Ariz. Dep't of Econ. Sec. v. Ciana H.*, 191 Ariz. 339, 341-42, 955 P.2d 977, 979-80 (App. 1998).

## II.     Father's Arguments Regarding Severance

**¶22**     Father argues the juvenile court erred in terminating his parental rights on the ground of fifteen months' out-of-home placement.

**¶23**     Under A.R.S. § 8-533(B)(8)(c), the juvenile court may terminate parental rights if DCS "has made a diligent effort to provide appropriate reunification services"[7] and:

> [t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order . . .,[8] the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

**¶24**     Father argues that, although he has been unable to remedy the circumstances that caused the children to be in an out-of-home placement, he demonstrated some ability to address those circumstances, and the juvenile court erred in finding there is a substantial likelihood he

---

[7]     Father states once in his brief that the juvenile court erred in finding DCS made a diligent effort to provide appropriate reunification services. He fails to develop or support his argument, however, and his conclusory statement comes in the midst of his argument about how he "made appreciable, good faith efforts to comply with the services offered by DCS." Moreover, given the number of services DCS offered Father in this case—including hair follicle and urinalysis testing, substance abuse assessment and treatment, case management services, case plan staffings, team decision making meetings, a psychological evaluation, domestic violence counseling, individual and couples counseling, parent aide services, transportation, and visitation—and Father's failure to challenge the sufficiency and appropriateness of these services during the dependency or on appeal, Father has waived his right to argue that DCS failed to provide appropriate reunification services. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 177-79, ¶¶ 10-18, 319 P.3d 236, 239-41 (App. 2014).

[8]     Neither Father nor Mother challenges the juvenile court's finding that the children have lived in an out-of-home placement for at least fifteen months under court order. Accordingly, each has conceded the accuracy of that finding. *See Britz v. Kinsvater*, 87 Ariz. 385, 388, 351 P.2d 986, 987 (1960). Moreover, reasonable evidence supports the finding.

will not be capable of exercising proper and effective parental care and control in the near future.

¶25 The fifteen-month out-of-home placement ground does not demand, however, that the juvenile court measure a parent's efforts at remedying the circumstances described above. *Compare* A.R.S. § 8-533(B)(8)(a), *with* (c). The statute requires only that the court assess a parent's ultimate ability or inability to remedy those circumstances—apart from the parent's efforts. *See Maricopa Cty. Juv. Action No. JS-6520*, 157 Ariz. 238, 243, 756 P.2d 335, 340 (App. 1988) (comparing A.R.S. § 8-533(B)(8)(a)'s predecessor, A.R.S. § 8-533(B)(6)(a) (one-year out-of-home placement ground), with A.R.S. § 8-533(B)(8)(c)'s predecessor, A.R.S. § 8-533(B)(6)(b) (two-year out-of-home placement ground)). For the longer period, the standard is lessened: *an inability to remedy the situation*, rather than substantial neglect or a willful refusal. *Id.*

¶26 In this case, reasonable evidence supports the juvenile court's finding that a substantial likelihood exists that Father will remain unable to exercise proper and effective parental care and control in the near future. The children were placed in the care of DCS in January 2014, and by September 2016, Father had still failed to remedy the circumstances causing the children's out-of-home care. He continued to abuse alcohol and illegal substances and to engage in domestic violence despite the children's first removal, the numerous rehabilitative services DCS offered him for more than two-and-a-half years, the children's return to him, the children's second removal, and the motion to terminate his parental rights to the children. The DCS case manager testified Father was not only unable, but had willfully refused, to remedy the circumstances that caused the children's out-of-home placement, and she opined he would likely remain unable to exercise proper and effective parental care and control in the foreseeable future. The extensive record fully supports her testimony. Accordingly, reasonable evidence supports the juvenile court's finding that clear and convincing evidence supports terminating Father's parental rights to the children on the fifteen-month out-of-home placement ground.[9]

---

[9] Because we affirm the juvenile court's severance finding under the fifteen-month out-of-home placement ground, we do not address Father's challenges to the nine-month out-of-home placement and chronic substance abuse grounds. *See Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205; *see also* A.R.S. § 8-533(B) (requiring that evidence sufficient to justify the termination of the parent-child relationship include "any one" of the enumerated termination grounds).

### III.    Mother's Arguments Regarding Severance

**¶27**        Mother argues she was denied (1) due process and (2) effective assistance of counsel at the severance hearing.  We review *de novo* constitutional claims.  *Emmett McLoughlin Realty, Inc. v. Pima Cty.*, 212 Ariz. 351, 355, ¶ 16, 132 P.3d 290, 294 (App. 2006).

**¶28**        Before we address Mother's issues, we first examine the proceedings from which Mother assigns error:  When DCS filed the severance motion, DCS also notified Mother that the court had set an initial termination hearing and that she had the right to participate in the termination proceedings with counsel.  At the initial termination hearing, with Mother present, Mother's counsel indicated he had seen the motion, announced that Mother denied the motion's allegations, and asked the court to set a termination adjudication hearing.

**¶29**        On the day of the termination adjudication hearing, Mother and her counsel appeared, and Mother's counsel notified the court that Mother had consented in writing to the termination of her parental rights. Mother's counsel moved to withdraw from representing Mother and requested that the court excuse Mother and him from the hearing.  Counsel further explained that he and Mother had "been talking about it for the last couple of months leading up to today's hearing."  The court questioned Mother at length about her consent, and although Mother expressed her understanding of the consent and indicated that was what she wanted to do, the court expressed concerns about Mother's mental health issues and whether "she knows in fact what she's doing by consenting."  The court refused Mother's consent and denied her counsel's motion to withdraw, but allowed Mother and her counsel to leave if they believed "that it may be a waste of their time."[10]  After a brief recess, Mother's counsel moved for reconsideration, but the court denied that motion and ordered that the hearing proceed.

**¶30**        Mother and her counsel remained in the courtroom, and her counsel engaged in nearly the entire hearing, including testimony by the DCS case manager and Father, the only two witnesses.  During that time, Mother's counsel made relevant objections to the case manager's testimony and cross-examined her.

---

[10]    On this record, the court did not abuse its discretion in declining to accept the consent and denying counsel's motion to withdraw; however, the court should not have invited Mother and her counsel to leave.

¶31 After Mother's counsel had completed cross-examining the case manager, he notified the juvenile court that he would have to leave "by 3:30" p.m. Later, after Father fully testified, Mother's counsel left during a brief recess, and the court noted on the record that he was no longer present. The court allowed the proceedings to continue, and the state's attorney elicited brief rebuttal testimony from the case manager regarding Father's refusal to accept services from the substance abuse treatment provider and Father's use of Mother's medication. Although the case manager's testimony pertained only to Father, the court allowed Mother to present her own cross-examination, in which she asked about the restraining order she had sought against Father, and she elicited testimony that the case manager had at some time told a worker from Southwest Behavioral Health Services that Mother "loved [her] kids and that [she] should probably get another psych evaluation."[11] Mother subsequently presented her own closing argument.

¶32 In terminating Mother's parental rights, the court found the state had not proved by clear and convincing evidence the alleged grounds of neglect and abuse. However, the court found the state had proved the other alleged grounds, and found that "subsequent efforts [to reunify the family] would have been futile because of [M]other's condition."

### A. Due Process

¶33 Mother argues the juvenile court denied her due process by continuing with the termination adjudication hearing despite the fact that her counsel was not present for the latter portion of the hearing. Although we do not condone Mother's counsel's actions in leaving early, we do not vacate the severance on this basis.

¶34 Neither Mother nor her attorney raised the issue of due process or objected to continuance of the proceedings in the juvenile court, and Mother has therefore waived her arguments on appeal. *See Englert v. Carondelet Health Network*, 199 Ariz. 21, 26, ¶ 13, 13 P.3d 763, 768 (App. 2000) (recognizing that "we generally do not consider issues, even constitutional issues, raised for the first time on appeal" (citation omitted)). We are aware

---

[11] Father's counsel then cross-examined the case manager, and followed up Mother's cross-examination by asking whether Mother needed and had received a second psychological evaluation. The case manager explained that DCS had not referred Mother for a second evaluation, but that, to her knowledge, Mother was scheduled to receive one from her provider, although "[w]hether or not they did that, I'm unsure."

that the doctrine of fundamental error, typically reserved for criminal matters, has been applied in severance cases. *See, e.g., Monica C. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 89, 94, ¶ 23, 118 P.3d 37, 42 (App. 2005); *see also State v. Henderson*, 210 Ariz. 561, 567-68, ¶¶ 19-26, 115 P.3d 601, 607-08 (2005) (holding that a defendant forfeits review of all but fundamental, prejudicial error by failing to object at trial). Even assuming fundamental error review is appropriate in this context, however, Mother has nonetheless waived her claim on appeal because, in her opening brief, she did not acknowledge she failed to raise the arguments below or assert that we should apply fundamental error review, much less attempt to show any error was fundamental and caused her prejudice. *See State v. Moreno-Medrano*, 218 Ariz. 349, 354, ¶ 17, 185 P.3d 135, 140 (App. 2008) (holding that the failure to allege fundamental error waives the argument on appeal); *see also Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App. 1996) ("Issues not clearly raised and argued in a party's appellate brief are waived." (citations omitted)); *Dawson v. Withycombe*, 216 Ariz. 84, 111, ¶ 91, 163 P.3d 1034, 1061 (App. 2007) ("We will not consider arguments made for the first time in a reply brief." (citation omitted)).

**¶35** Mother also argues that her counsel erred by absenting himself from the hearing before it was complete and by failing to object to the juvenile court continuing to hold the hearing in his absence.

**¶36** However, "no reversal of a termination order is justified by inadequacy of counsel unless, at a minimum, a parent can demonstrate that counsel's alleged errors were sufficient to undermine confidence in the outcome of the severance proceeding and give rise to a reasonable probability that, but for counsel's errors, the result would have been different." *John M. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 320, 325, ¶ 18, 173 P.3d 1021, 1026 (App. 2007) (citations and internal quotations omitted).

**¶37** Here, Mother has provided no basis for us to conclude that the severance proceedings in her case were fundamentally unfair, that the result of the hearing is unreliable, or that, had her counsel conducted himself differently, the juvenile court would have reached a different result. *See id.* at ¶ 19. Accordingly, Mother has provided no basis for this court to vacate termination of her parental rights on the basis of ineffective assistance of counsel. *See generally Pima Cty. Severance Action No. S–2397*, 161 Ariz. 574, 578, 780 P.2d 407, 411 (App. 1989) (affirming a juvenile court's termination of parental rights where a parent failed to establish that her counsel's performance was both incompetent and prejudicial).

### B.  Diligent Efforts

**¶38**  Mother next argues that insufficient evidence supports the court's finding that DCS made a diligent effort to provide her appropriate reunification services because DCS did not grant her request for a second psychological evaluation.  Mother's argument suggests she believes a second psychological evaluation might have revealed a change in her ability to parent.

**¶39**  DCS makes a diligent effort to provide appropriate reunification services when it gives the parent "the time and opportunity to participate in programs designed to help her to become an effective parent." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 14, 256 P.3d 628, 632 (App. 2011) (citation omitted).  DCS "is not required, however, to provide every conceivable service or to ensure that a parent participates in each service it offers."  *Id.* at ¶ 15 (citation and internal quotation omitted).  DCS also need not duplicate a service the parent has already received, at least when such services would clearly prove futile.  *See Pima Cty. Severance Action No. S-2397*, 161 Ariz. 574, 577, 780 P.2d 407, 410 (App. 1989); *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046, 1053 (App. 1999) (recognizing the state must only "undertake measures with a reasonable prospect of success").  Further, DCS need not undertake rehabilitative measures indefinitely. *See Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577, 869 P.2d 1224, 1230 (App. 1994).

**¶40**  Even assuming Mother's claim is not moot for failure to contest the juvenile court's finding from the bench that "subsequent efforts [to reunify the family] would have been futile because of [M]other's condition," reasonable evidence supports the court's finding that DCS made diligent efforts to provide appropriate reunification services.

**¶41**  DCS provided Mother with mental health services, including DBT and domestic violence counseling, a psychological evaluation, as well as initial substance abuse testing and assessment, case management services, case plan services, case plan staffings, child and family team meetings, individual and couples counseling, parent aide services, parenting classes, visitation, transportation, and in-home services upon reunification.  However, as the juvenile court found, "Mother has a number of mental health diagnoses which indicate she is unable to safely parent the children alone."  The case manager opined that Mother's condition would continue indefinitely and, accordingly, providing Mother with extra rehabilitative services, including further evaluations, would be futile.  The court recognized this fact when it found "[M]other has engaged in a

number of services aimed at eliminating the need for continued out of home placement; however, [M]other continues to make poor decisions especially in the area of protecting herself and by extension the children from danger in the form of domestic violence." Reasonable evidence supports the court's finding that DCS made a diligent effort to provide Mother appropriate reunification services.

### C. Fifteen Months' Out-of-Home Placement Ground

¶42 Mother also argues the juvenile court erred in terminating her parental rights on the ground of fifteen months' out-of-home placement.

¶43 In this case, reasonable evidence supports the juvenile court's finding that a substantial likelihood exists that Mother will remain unable to exercise proper and effective parental care and control in the near future. After the children's second removal, she missed numerous visits with the children, did not actively engage in services, took her medication inconsistently, and consumed alcohol. Further, she never secured stable housing and continued to stay in a violent relationship with Father. The DCS case manager testified that Mother made inappropriate decisions even when she was using her medication and that she was unwilling to remedy the circumstances that caused the children's second removal. The case manager opined that Mother's condition would continue indefinitely, and she would likely remain unable to exercise proper and effective parental care and control in the foreseeable future. The case manager added that Mother could not "keep herself safe, let alone her two children. She struggles with her own mental instability, which doesn't allow her to . . . care for herself and puts the children at risk. . . . There's been no change of her behavior for the last two years." The juvenile court did not err in finding that severance on the basis of fifteen months' out-of-home placement was supported by clear and convincing evidence.[12]

### IV. Best Interests

¶44 Neither Father nor Mother challenges the juvenile court's finding that severance was in the children's best interests. Nonetheless, we note that the record supports the finding. *See generally Maricopa Cty. Juv.*

---

[12] As is the case with Father, because we affirm the juvenile court's severance finding under the fifteen-month out-of-home placement ground, we do not address Mother's challenges to the nine-month out-of-home placement and mental health grounds. *See Jesus M.*, 203 Ariz. at 280, ¶ 3, 53 P.3d at 205; A.R.S. § 8-533(B).

*Action No. JS–500274*, 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990) (recognizing that "best interests of the child are a necessary, but not exclusively sufficient, condition for an order of termination").

**¶45** The court found and the record supports that termination of the parents' rights would further the plan of adoption, which would provide the children with permanency and stability. *See Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6, 100 P.3d 943, 945 (App. 2004). Further, the children are residing in an adoptive placement that is meeting all of their needs. *See Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998). Finally, the children are adoptable and another adoptive placement could be located should the current placement be unable to adopt. *See Mary Lou C.*, 207 Ariz. at 50, ¶ 19, 83 P.3d at 50.

## CONCLUSION

**¶46** The juvenile court's order terminating the parents' parental rights to the children is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA

14