NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO A.O.

No. 1 CA-JV 25-0146

FILED 04-30-2026

Appeal from the Superior Court in Maricopa County
No. JD536046
The Honorable Suzanne E. Cohen, Judge

**AFFIRMED**

COUNSEL

Ashley P., Apache Junction
*Appellant*

Slaton Roebuck PLLC, Scottsdale
By Sandra L. Slaton
*Counsel for Appellant Leah M.*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellee*

Maricopa County Office of Legal Advocate, Phoenix
By Amanda L. Adams
*Counsel for Appellee Child*

---

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Angela K. Paton and Judge Jennifer M. Perkins joined.

---

**C A T L E T T**, Judge:

¶1        Leah M. ("Grandmother") and Ashley P. ("Aunt") (collectively with Grandmother, "Petitioners") both petitioned the juvenile court to have A.O. ("Child") declared dependent as to Richard O. ("Father").  The juvenile court denied those petitions.  Petitioners appeal.  Because the record supports the juvenile court's decision, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Father and Melissa O. ("Mother") had Child in August 2017.  Mother died in August 2023, when Child was six years old.  Police determined Mother committed suicide, but Petitioners believe Father killed her.  They also believe Child, who has a heart condition known as Tetralogy of Fallot, is medically fragile and may be critically ill because of Father's alleged medical neglect.

¶3        In December 2023, Grandmother petitioned for *in loco parentis* legal decision-making authority, and Aunt petitioned for visitation.  Those cases were consolidated and remain active in the family court.

¶4        In October 2024, Grandmother filed a dependency petition.  The juvenile court ordered the Department of Child Safety ("Department") to investigate her allegations of abuse and neglect.  An investigator with the Department interviewed Father, Child, Child's half sibling, Grandmother, and Aunt.  The Department reported to the court that Father was meeting all of Child's basic medical, behavioral health, and parenting needs.  The Department concluded Father's home was safe and appropriate, and it did not observe any signs that Father abused alcohol.  The Department recommended Child remain in Father's custody.

¶5        At the initial dependency hearing in November 2024, the Department asked to be excused from the case, and Child's attorney moved

to dismiss the dependency. The juvenile court dismissed that petition. Grandmother petitioned for special action relief; we declined jurisdiction.

¶6        In March and April 2025, Petitioners filed new dependency petitions. Their petitions made similar allegations: (1) Father neglected Child's medical and behavioral health needs; (2) Father abused alcohol; and (3) Father physically, mentally, and emotionally abused Child.

¶7        The juvenile court ordered the Department to conduct another investigation. The Department's again recommended that Father maintain custody of Child. The Department's investigator noted that the Department had interviewed Child for the fifth time, and Child "has not disclosed maltreatment[.]" The investigator expressed concern that exposing Child to "unnecessary questioning without a change in family circumstances is likely to have a negative impact on [Child's] emotional well-being."

¶8        In August 2025, the juvenile court held a three-day dependency adjudication hearing. The court heard testimony from Father, Grandmother, Aunt, two Department investigators, Father's former girlfriend, a private investigator, and two expert witnesses.

¶9        After the hearing, the juvenile court denied both petitions. The court found Petitioners "have little credibility." The court also expressed concern that their "vendetta against [F]ather could be causing emotional stress in [Child]." The court found there was "no credible evidence" that Father abused Child.

¶10        Petitioners moved to alter or amend that decision. The juvenile court denied those motions, and Petitioners timely appealed.

## JURISDICTION

¶11        Petitioners ask us to treat their opening briefs as petitions for special action and accept special action jurisdiction. They contend Father is endangering Child by neglecting her medical care and Grandmother claims "the standard appellate process" is too slow to protect Child's welfare.

¶12        To initiate a special action, a petitioner must ordinarily file a petition for special action. *See* RPSA 14(a). Compliance with these rules alerts this court to the request for special action relief and ensures a panel of judges promptly reviews the matter.

**¶13** Petitioners have initiated three petitions for special action concerning these dependency proceedings. *See* 1 CA-SA 25-0011, 1 CA-SA 25-0103, and 1 CA-SA 25-0106. Yet neither Petitioner filed a separate petition for special action challenging the juvenile court's dependency decision. As a result, the parties have now fully briefed this appeal. At this point in the appellate process, converting this appeal into a special action would not expedite the decision. Moreover, the "standard appellate process" is not too slow to address the issues Petitioners raise. *See* Ariz. R.P. Juv. Ct. 602(a). Because Petitioners have an adequate remedy by direct appeal, we decline to accept special action jurisdiction. *See* RPSA 12(a). We instead exercise appellate jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1).

## DISCUSSION

**¶14** A dependency determination requires proof by a preponderance of the evidence based on "the circumstances as they exist at the time of the dependency adjudication." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48 ¶ 1 (App. 2016); A.R.S. § 8-844(C)(1). A child's best interests is the primary concern in a dependency case. *Joelle M. v. Dep't of Child Safety*, 245 Ariz. 525, 527 ¶ 10 (App. 2018). A child is dependent if the parent does not provide "proper and effective parental care and control[.]" A.R.S. § 8-201(15)(a)(i). A dependent child is also one "whose home is unfit by reason of abuse [or] neglect" by the parent. A.R.S. § 8-201(15)(a)(iii). "Neglect" is "[t]he inability or unwillingness of a parent . . . to provide that child with . . . medical care" which "causes substantial risk of harm to the child's health or welfare[.]" A.R.S. § 8-201(25)(a); *see also* A.R.S. § 8-819(1) ("consideration shall be given to" a parent's "alcohol abuse" when "determining if a child is neglected").

## I. Precluding Witnesses and Evidence

**¶15** Petitioners argue the juvenile court abused its discretion by precluding testimony from Child's physicians and medical records containing hearsay. We will not disturb the court's evidentiary rulings without a clear abuse of discretion and resulting prejudice. *Johnson v. Provoyeur*, 245 Ariz. 239, 241–42 ¶ 8 (App. 2018).

### A. Disclosure Sanctions

**¶16** Relying on *Hays v. Gama* and Rule of Procedure for the Juvenile Court ("Rule") 301(b) and Rule 315(g), Grandmother insists that precluding Child's doctors from testifying was error because doing so

significantly impacted the court's ability to determine Child's best interests. 205 Ariz. 99, 103–04 ¶¶ 21–23 (2003).

**¶17** In *Hays*, the family court imposed evidentiary sanctions on the mother in a child-custody matter due to contempt of court. *Id.* at 101 ¶ 9. Our supreme court vacated those sanctions, explaining the discovery rules did not authorize the exclusion because the family court had not determined that the mother violated any discovery order, and "the sanctions were imposed pursuant to the court's inherent contempt power." *Id*. at 101–02 ¶¶ 14–16, 104 at ¶ 24. The court concluded that excluding the evidence "effectively preclude[d] potentially significant information from being considered in the custody determination" and impacted the family court's ability to determine the child's best interests. *Id*. at 103–04 ¶ 22.

**¶18** Here, the juvenile court did not abuse its discretion by precluding untimely disclosed witnesses. At a pretrial hearing in June 2025, Grandmother moved to continue the adjudication hearing because she hired new counsel and failed to file a timely disclosure statement. The court granted the motion over Father's objection. But the court told Grandmother that "the disclosure statement and any evidence must be disclosed by Friday [June 13, 2025]. The disclosure is closed down as of Friday. Anything sent after that would not be admitted." Grandmother filed a timely disclosure statement listing 30 witnesses, which she later supplemented after the disclosure deadline to add three more witnesses.

**¶19** In August 2025, two days before the adjudication hearing, the juvenile court held a status conference to address evidentiary issues. The court observed that Petitioners had disclosed 33 witnesses. The court also noted that Grandmother had moved for Dr. Ellsworth, Child's cardiologist, to appear virtually, but that he was not listed among her 33 witnesses. The court told Grandmother that "if he's not disclosed, he's not testifying. Discovery is closed." The court told Petitioners to pare down the witness list and provide an updated list to counsel by the close of business the next day. Rather than trimming witnesses, Grandmother filed a second supplemental disclosure statement adding Child's cardiologist and pediatrician. At the adjudication hearing the next day, the court sustained Father's objection to the untimely witnesses.

**¶20** Under these circumstances, the juvenile court's sanctions were reasonable because Grandmother and Aunt did not show good cause for their non-compliance with Rule 315 and the court's disclosure orders. *See Johnson*, 245 Ariz. at 243 ¶ 16 (noting the parent's failure to show good cause for non-compliance). We also reject Grandmother's contention that

her motion for Dr. Ellsworth to appear virtually, which the court granted two days before the hearing, substituted for proper disclosure.

## B. Ability to Assess Child's Best Interests

**¶21** Grandmother also relies on *James A. v. Department of Child Safety*, to argue the juvenile court abused its discretion by precluding their evidence because they did not have other evidence that could substitute for Child's physicians and medical records. 244 Ariz. 319 (App. 2018).

**¶22** In *James A.*, the juvenile court denied the father's motion to continue the termination hearing and precluded the father's expert report for being two days late. *Id.* at 322 ¶¶ 9–10. We reversed, holding that "[b]ecause a court has an 'overriding obligation to consider the best interests of the child,'" the court erred "by precluding the potentially outcome-determinative" expert report. *Id.* at 322 ¶ 13. We noted the parent possessed no other evidence that could substitute for that report. *Id.* ¶ 12.

**¶23** In *Johnson*, however, we upheld the juvenile court's exclusion of an untimely supplemental expert report because the expert's testimony regarding the original report, along with other evidence, gave the court "sufficient information to assess the children's best interests." 245 Ariz. at 243–44 ¶¶ 16–17. We held that the court may impose a sanction, including preclusion, for untimely disclosure, but when it does so, the court must have sufficient information to assess the child's best interests. *Id.* at ¶ 17. We also warned that a party may not use *Hays* "to flout multiple disclosure deadlines without good cause[.]" *Id.* at 245 ¶ 20.

**¶24** The juvenile court here had sufficient medical information to assess Child's best interests and the allegations of medical neglect. Father testified about Child's medical issues. He explained that Child had Tetralogy of Fallot, which was corrected at birth. He explained she may need another heart surgery and is in a yearly monitoring program. He explained that Child dances competitively and has no exercise restrictions. He acknowledged that he was late taking Child to a heart doctor, which he attributed to this litigation.

**¶25** Father also testified about Child's pediatrician visits. He explained that Child does not have asthma, but she has been treated for it in the past. He testified he took Child to the pediatrician in 2024 because she had a urinary tract infection and constipation. He testified Child has seasonal eczema, which he treats with prescription creams.

¶26        Petitioners called a pediatric hospitalist, Dr. Ralph Martello, to testify as an expert about Child's medical issues. Dr. Martello testified about Child's diagnosis with Tetralogy of Fallot, her skin condition, her 2024 echocardiogram, and her frequent visits to the school nurse. He testified that at Child's last cardiologist appointment, her doctor was very encouraged about how Child was doing and encouraged the family to treat her normally without any restrictions. He added that her echocardiogram showed her "prior surgeries were holding up well and her heart was functioning very nicely." But he testified that he was "very concern[ed]" Child was overdue for her annual follow-up appointment with her cardiologist.

¶27        Dr. Martello also reviewed the pediatrician's visit summary from February 2024 and testified about the pediatrician's treatment of Child's other medical issues. The court admitted Dr. Martello's written report into evidence.

¶28        The juvenile court also considered Child's school nurse records. The court found that Child visited the school nurse 24 times between September 2023 and December 2024. The court noted that Dr. Martello testified that the number of visits is "unusual and could indicate medical or mental health concerns." The court observed that Mother died in August 2023 and Father was addressing Child's mental health through therapy. The court found that Child had seen the school nurse only three times after January 2025, and that "[w]hatever was causing [Child] to visit the nurse so often after her mother died has seemed to resolve."

¶29        The Department's first court report contained visit summaries from Child's cardiologist appointments beginning after her surgery in December 2017 and continuing through March 2024. The Department's case notes also summarized those appointments and were admitted into evidence. Consistent with Father's and Dr. Martello's testimony, these records indicate that Child was doing well and the family should treat her as a normal child without any physical restrictions or limitations.

¶30        In sum, the juvenile court had sufficient information to assess Child's best interests even after precluding untimely disclosed witnesses. *See Johnson*, 245 Ariz. at 243 ¶ 17.

## C.        Precluding Hearsay Records

¶31        Grandmother argues the juvenile court abused its discretion by precluding Child's medical records, which she asserts "compound[ed] violations" of *Hays* and Rules 301(b) and 315(g). Grandmother contends

the pediatrician's visit summaries would not have been hearsay if the court had permitted Child's physician to testify about the documents. *See* Ariz. R. Evid. 803(6)(D). Alternatively, she argues these records were admissible to impeach Father.

**¶32**     Petitioners were responsible for presenting evidence to support their allegations. *See* A.R.S. § 8-844(C)(1). The record shows Grandmother and Aunt had Child's pediatric records since at least March 2025, when Aunt attached them to her dependency petition. If they intended to admit Child's medical records, they needed to obtain certified copies. Ariz. R. Evid. 803(6)(D). Furthermore, the juvenile court did not err by refusing to allow Grandmother to impeach Father with medical records that he did not author. *See* Ariz. R. Evid. 607–609 (impeachment), and 806 (prior-inconsistent statements).

## II.     Due Process

**¶33**     Grandmother next argues the juvenile court deprived her of due process and a meaningful opportunity to "*fully* argue and present evidence regarding the medical neglect allegations within her dependency petition." She relies on *Matter of Guardianship of A.K.*, 258 Ariz. 336, 343 ¶ 17 (App. 2024). There, we noted a "court violates a litigant's due process rights if it affords the party no meaningful opportunity to be heard." *Id.* at 343 ¶ 20 (citations omitted). But here, the court gave Grandmother three days to present her case, which was what the parties requested. That was ample time for Grandmother to present her case.

**¶34**     Aunt likewise argues the juvenile court denied her due process because it precluded her from meaningfully participating in the adjudication hearing. She contends the court did not admit the 27 exhibits she attached to her petition. But she never submitted those exhibits to be marked at the hearing nor offered them for admission into evidence. After Grandmother rested, the court asked Aunt if she wanted to call any witnesses or present evidence. She responded, "No, ma'am." The juvenile court did not violate either Grandmother's or Aunt's due process rights.

## III.     Child's Counsel

**¶35**     Aunt argues the juvenile court erred by permitting Child's counsel to oppose the dependency petitions and by allowing counsel to object to Aunt's evidence and witnesses. Aunt waived this argument by not making it in the juvenile court. *See Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452 ¶ 21 (App. 2007) ("We generally do not consider arguments raised for the first time on appeal."). Aunt also appears to claim

in her reply brief that the court never ruled on her request to appoint Child a guardian *ad litem*. We will not consider arguments made for the first time in a reply brief. *Dawson v. Withycombe*, 216 Ariz. 84, 111 ¶ 91 (App. 2007).

**¶36** Waiver aside, Aunt incorrectly characterizes Child's counsel as a "best interests attorney." The juvenile court must appoint an attorney for all children in dependency or termination cases. *See* A.R.S. § 8-221(A), (F); Ariz. R.P. Juv. Ct. 303(c). Under Juvenile Rule 303(c), "[t]he child's attorney owes the same duties, undivided loyalty, confidentiality, and competent representation, to the child as is due an adult client." A child's attorney must advocate for the child consistently with the child's objectives or expressed preferences. Ariz. R.P. Juv. 306(a)(1)(A); *see also* Ariz. R. Sup. Ct. 42, ER 1.2(a).

**¶37** Here, Child's counsel met with Child multiple times without Father present. Child's counsel reported to the juvenile court that Child's "position is she wishes . . . to remain with [Father]." Child's position was consistent with her statements to Department investigators that Father loves her, they get along well, she feels safe at home, and there is nothing she would change about him. Given Child's position, her counsel appropriately advocated for her during the adjudication hearing.

## IV. Sufficiency of the Evidence

**¶38** We review dependency findings for an abuse of discretion. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488 ¶ 12 (App. 2015). We view the evidence in the light most favorable to upholding the juvenile court's dependency finding and will affirm the court's finding unless "no reasonable evidence supports it." *Shella H.*, 239 Ariz. at 48, 50 ¶¶ 1 n.1, 13 (citations omitted); *cf. Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023). We do not reweigh the evidence or reevaluate the credibility of witnesses. *Maria G. v. Dep't of Child Safety*, 253 Ariz. 364, 366 ¶ 8 (App. 2022).

### A. Substance Abuse

**¶39** Grandmother argues the juvenile court abused its discretion by making incorrect and inconsistent findings about Father's drinking. The court found the following:

> Father admittedly drinks alcohol; however, he was untruthful about drinking alcohol and driving with [Child]. Consuming alcohol and driving intoxicated is illegal. Consuming alcohol and driving while not intoxicated is not illegal. Father

admitted to drinking at a party in February 2025 but denied driving [Child]. This was untrue. However, there was no evidence presented he was intoxicated.

**¶40** Grandmother contends the court made an arbitrary distinction between "[c]onsuming alcohol and driving intoxicated" and "[c]onsuming alcohol and driving while not intoxicated." She further asserts it is unlawful under A.R.S. § 28-1381(A)(1) to drive under the influence of alcohol if the person is "*impaired to the slightest degree*." She insists the court's findings about Father's drinking support information she gave Dr. Martello that in February 2025 Father drove with Child while intoxicated "prompting a renewed [Department] intervention."

**¶41** Aunt hired private investigators to surveil Father over about 10 days between December 2024 and February 2025. At the hearing, one of the private investigators testified that he observed Father drinking alcohol at a birthday party at a restaurant in February 2025. He further testified that Father left the restaurant and drove home with Child in the vehicle. He described how, as soon as Father left the restaurant's parking lot, the police began following Father. The private investigator reported that the police followed Father for about 20 minutes as he drove home, but the private investigator never saw the police pull Father over. Based on this testimony, the juvenile court reasonably inferred that the police would have stopped Father if they thought he was impaired.

**¶42** Reasonable evidence also supports the juvenile court's findings that "there was no credible evidence presented that [F]ather has an alcohol abuse problem," and that Petitioners provided their expert witness with "exaggerated and misleading information" about Father's drinking. For instance, Father's former girlfriend testified that he drank at a party in December 2024, but he did not appear impaired when driving his daughter home. She testified she would have called him an Uber if she felt he was under the influence. Grandmother also testified that at her birthday party in July 2023, Father drank excessively and then drove home with Child, Mother, and Grandmother in the vehicle. But the court noted that because Grandmother "got in the car, the court can only assume [F]ather was not intoxicated."

### B. Child's Therapy

**¶43** Grandmother argues the juvenile court abused its discretion by finding that her expert witness, Dr. Kathie Mathis, a clinical psychologist, had "little credibility" and by giving Dr. Mathis' testimony

"no weight." She asserts the court should have given greater weight to Dr. Mathis' opinion that Child's therapy was below the standard of care and amounted to "clinical neglect."

¶44 The juvenile court found Dr. Mathis reviewed several reports and relied heavily on biased information from Petitioners. The court also determined that Dr. Mathis made several unsupported and exaggerated assertions. Dr. Mathis, for example, opined that Father was a "self-admitted abuser," which was false. She elaborated that the basis for this opinion was that he had told police he argued with Mother and acknowledged he needed patience and to calm down. She testified that Child's statement to a Department investigator—that three times Father dragged her to her room and made her stay in her room until she calmed down—showed that Father abused Child and exercised "relationship terrorism" and committed illegal "hostage-taking and barricading."

¶45 The juvenile court also found that Dr. Mathis ignored Child's multiple positive statements about Father, including that she told Department investigators that Father loves her, they get along well, she feels safe at home, and there is nothing she would change about him. Reasonable evidence supports the court's findings and credibility assessments concerning Dr. Mathis.

¶46 Grandmother asserts that Dr. Mathis' testimony established that better therapy is available to address Child's special needs, and that the juvenile court erred by finding Grandmother failed to prove Child's current therapy presented an unreasonable risk of harm to Child. To the contrary, reasonable evidence also supports the juvenile court's conclusion that Child's therapy did not threaten her health or welfare. Child reported to the Department that she sees her therapist every Friday and enjoys therapy because her therapist is fun and they do activities and read books together. The juvenile court found Child "likes her therapist and wants to stay working with her." The court astutely observed that Child's comfort with her therapist is vital for effective treatment. The court also carefully reviewed Child's therapy records and her school nurse records.

### C.     Child's Skin Condition

¶47 Aunt argues the juvenile court mischaracterized Dr. Martello's testimony. She asserts Dr. Martello testified that Child did not have eczema and that the court was wrong to find Father "is treating [Child's] skin condition with a cream, one of the treatments suggested would be appropriate by Dr. Martello." Aunt says Dr. Martello "testified

11

the lesions on A.O.'s face, back, and legs were not eczema, yet the court allowed this condition to remain unresolved and improperly untreated, despite medical evidence that it's an autoimmune disorder which, when combined with [A.O.'s] Tetralogy of Fallot, poses a serious and potentially life-threatening risk."

¶48        Dr. Martello testified Child's skin condition did not look like "classic" eczema.  He noted that eczema "can potentially present on the face," but that Child may have a "a condition such as vitiligo."  He testified that there are overlapping treatments for these skin conditions, including steroid creams, ointments, and phototherapy.  He admitted that he has never met Child and has never communicated with her doctors.

¶49        Father testified that Child's pediatrician prescribed a cream for her eczema.  He explained that he has treated Child's skin condition with these creams every summer since 2018.  The Department investigator testified that Father showed her the cream he uses for Child's skin condition, and that it was in a prescription box with Child's name on it.  Reasonable evidence supports the juvenile court's finding that Father was adequately addressing Child's skin condition.

### D.        Department After-Care Plan

¶50        Aunt argues the juvenile court erred by finding that an unsigned 2024 Department after-care plan did not bind Father.  She argues the plan was essential and prohibited Father from drinking alcohol while caring for Child.

¶51        There is no evidence that the Department made the plan a condition for Father to retain custody of Child.  Father did not sign the plan.  And when the Department closed its investigation in May 2024 and found the child abuse report "unsubstantiated," the Department recommended only "[c]ommunity [r]esources" for the family.  The juvenile court correctly concluded that "[t]here was no evidence presented that [the Department] made this plan a condition for anything regarding caring for [Child], or that [F]ather agreed to it."

### E.        School Nurse Records

¶52        Aunt argues the juvenile court erred by delaying the admission of the school nurse records and only admitting them after she rested her case.  She also asserts the court erred by relying on incomplete school nurse records.  She further asserts the records do not support the

court's finding that prior to her mother's death, Child visited the school nurse eight times between August 2022 and March 2023.

¶53 During the hearing, Aunt moved to admit the school nurse records. Child objected because the records were not certified, and the juvenile court sustained the objection. Later, Grandmother moved to admit the school nurse records, which the school principal had certified. The court admitted those records at the end of the hearing. A few days later, Grandmother moved to supplement the school nurse records because she alleged they were incomplete. But the court denied the motion as untimely because the "evidence was closed at the conclusion of the three-day evidentiary hearing."

¶54 Aunt had a reasonable opportunity to address the school nurse records during the hearing but did not do so. After the records were certified, Aunt never moved to admit them. And before closing evidence, the juvenile court asked Aunt if she wanted to present additional testimony or evidence, but she declined. The school nurse records also reasonably support the court's findings. The court did not err.

## V.    Incorrect and Hallucinated Citations

¶55 Aunt's opening brief cites legal authority that is either incorrect or non-existent. The juvenile court similarly observed that Aunt's briefs contained incorrect legal citations. Arizona Rule of Civil Appellate Procedure 13(a)(7) requires that briefs' arguments contain citations to legal authority. The integrity of the appellate process depends on accurate and honest advocacy. We "hold unrepresented litigants in Arizona to the same standards as attorneys and do not afford them special leniency." *Ramos v. Nichols*, 252 Ariz. 519, 522 ¶ 8 (App. 2022). We thus find Aunt's brief in violation of Rule 13(a)(7) and caution that in the future, failure to provide accurate legal authority may result in sanctions.

### CONCLUSION

¶56 We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR

13